PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 11-1239
———


UNITED STATES OF AMERICA

v.

ASHLEY ANDREWS,
                            Appellant


———


On Appeal from the District Court
of the Virgin Islands – Appellate Division
Division of St. Thomas
(D.C. No. 3-04-cr-00038-002)
District Judge:  Honorable Juan R. Sánchez

———


Argued December 5, 2011
Before:  FISHER, GREENAWAY, JR.
and ROTH, *Circuit Judges*.

(Filed:  June 4, 2012)

Denise M. Francois (Argued)
Hodge & Francois
1340 Taarneberg
St. Thomas, VI  00802
        *Counsel for Appellant*

Kim L. Chisholm
Office of United States Attorney
5500 Veterans Building, Suite 260
United States Courthouse
Charlotte Amalie, St. Thomas, VI  00802-6924

Paul A. Murphy (Argued)
Office of United States Attorney
1108 King Street, Suite 201
Christiansted, VI  00820

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Ashley Andrews ("Andrews") was convicted of one count of conspiracy, in violation of 18 U.S.C. § 371, four counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2, one count of program fraud, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2, one count of making a false claim

2

upon the Government of the Virgin Islands, in violation of 14 V.I.C. § 843(4), and one count of inducing a conflict of interest, in violation of 3 V.I.C. §§ 1102, 1103, and 1107. Andrews appeals his judgment of conviction and sentence. For the reasons set forth below, we will affirm the judgment of conviction, vacate the judgment of sentence on Counts One through Six, and remand to the District Court for resentencing.

I.

In 1985, the Government of the Virgin Islands ("GVI") and the United States entered into a consent decree in the District Court of the Virgin Islands, pursuant to which the GVI was to make improvements to its sewage system. For over fifteen years, the GVI failed to make the necessary repairs. In October 2001, the District Court held a hearing, requiring the GVI to show cause why it should not be held in contempt for failure to comply with the consent decree. Around this time, Ohanio Harris ("Harris"), who, in his capacity as Special Assistant to the Governor of the Virgin Islands, was responsible for handling issues regarding the sewage system, began to promote Andrews as a contractor who could repair the sewage system. Andrews had created a construction company called Global Resources Management ("GRM") in 2001. GRM, however, could not obtain the sewer repair contract without a Virgin Islands business license. Because a "tax clearance" letter was required before such a license could be issued, and Andrews could not obtain a "tax clearance" letter on his own, when GRM applied for the license in late February 2002, Harris was listed as the president of GRM on the application. Prior to February 2002,

3

Andrews had served as president of GRM, and on or about March 8, 2002, Andrews again replaced Harris as president of GRM.

On March 1, 2002, Harris and Andrews traveled to Tortola, British Virgin Islands to meet with representatives of the Berger Group, an American engineering firm. At this meeting, Harris, who was introduced as the Special Assistant to the Governor, vouched for Andrews, stating that Andrews had organized local contractors to work as subcontractors for large firms. Harris also indicated that he could arrange a meeting with the Governor to discuss awarding the sewage system contract to the Berger Group. Harris testified that after this meeting, he and Andrews went to a hotel, and Andrews paid him $2,500 in cash. The payment, Harris explained, was "for what [he] ha[d] done for [Andrews]." Harris deposited the check into his bank account and then used the money to make a mortgage payment on his home.

Around this time, Harris began to hold himself out as a liaison between GRM and Andrews, and the Virgin Islands Department of Public Works ("DPW"). Harris arranged a meeting between the Governor and Andrews to discuss the sewer repair work. After this meeting, Andrews asked Harris to help him get the contract, and Harris replied that he would "see what [he] c[ould] do." Harris testified that in exchange for his assistance in obtaining the contract, Andrews agreed that he would hire Harris to work at GRM after Harris retired from government service. On March 24, 2002, Harris again traveled to Tortola to meet with Andrews and representatives from the Berger Group. Harris testified that he told Andrews that he expected to be compensated for whatever assistance

4

he provided, and Andrews assured him that he would be paid. Harris subsequently set up additional meetings between Andrews, the Governor, and other GVI officials. At some point, GRM submitted a $3.6 million bid for the sewer repair work. The Governor testified that Harris told him "that [GRM] was a company that we should look at and see if they can do the job." The sewage system repair contract was not advertised, and there were no other contractors bidding for the project, despite the fact that, even in emergency situations, there were generally three bidders. Wayne Callwood ("Callwood"), the Commissioner of DPW, testified that "[b]asically, this project was sole-sourced to GRM."

The GVI tentatively accepted GRM's bid in October 2002, on the condition that GRM procured a performance bond and a payment bond, each for 100 percent of the contract price ($3.6 million). On October 7, Campbell Malone ("Malone"), a Certified Public Accountant acting on behalf of GRM, contacted Alan Feuerstein ("Feuerstein"), a New York attorney, for assistance in obtaining the bonds. Feuerstein put Malone in touch with Wayne Price ("Price"), a surety bond manager at Melwain Enterprises, in Long Island, New York. On October 10, Price faxed Malone, who was in the Virgin Islands, a collection of bond application paperwork. Price sent additional bond-related paperwork to Malone on October 11 (fax) and October 17 (email).

On October 18, Malone emailed Price a completed bond application package, which was signed by Andrews. This application contained numerous false representations, including statements that: (1) Andrews was divorced; (2) Andrews owned a home valued at $720,000, when, in

5

fact, his daughters owned the home; (3) Andrews had a one-third interest in a $150,000 property located at 113 Estate Grove Place, St. Croix; (4) Andrews had $7,000 in cash on deposit at the Banco Popular as of September 30, 2002; and (5) Andrews had stock in GRM worth $600,000. In the "work on hand" section of the application, which asked for a list of all of the contracts that GRM had secured but not yet completed, Malone and Andrews listed the following five "contracts" worth a total of $26 million: (1) a professional services contract worth $1.5 million; (2) a contract with the GVI for sewage system repair in the amount of $7.5 million, twice the price of the actual contract; (3) a construction management services contract for Peebles Hospital in the British Virgin Islands valued at $1 million; (4) a development contract worth $12 million; and (5) "work on hand" for processing municipal garbage. At trial, the Government proved that none of these contracts had been obtained. Additionally, the bond application falsely stated that: (1) GRM and its owners were not involved in any litigation, whereas Andrews was in the midst of a lawsuit related to another company that he owned; (2) GRM had a $350,000 "investment" in an affiliate, which in reality was worthless; and (3) that Robert Jarnis was a director of GRM, when he actually worked for the Berger Group in Massachusetts.

GRM had difficulty obtaining the bonds without a construction contract signed by the Governor. Accordingly, the Virgin Islands Attorney General advised the Governor to sign the contract, on the condition that no Notice to Proceed would be issued by the Department of Property and Procurement ("P&P") until GRM successfully obtained the

6

bonds.  The Governor signed the sewer system repair contract on December 20, 2002.

On January 23, 2003, the United States filed a motion to enjoin the enforcement of the contract.  On January 28, before GRM was able to obtain the required bonds and before any Notice to Proceed was issued, the Governor terminated the contract.  The GVI subsequently asked the District Court to remove the injunction, but the District Court refused, and enjoined the GVI from re-contracting with GRM.  *United States v. Gov't of Virgin Islands*, 248 F. Supp. 2d 420 (D.V.I. 2003), *affirmed in part and vacated in part* by *United States v. Gov't of Virgin Islands*, 363 F.3d 276 (3d Cir. 2004).

On June 12, 2003, Andrews submitted to the GVI a $748,304.92 post-termination claim, seeking payment for the time and resources GRM had expended preparing its bid. This claim included numerous false statements and duplicate charges.  Moreover, as evidence adduced at trial established, Andrews's entire scheme was fraudulent.  Callwood testified that "to the best of [his] knowledge, [GRM was not] capable of doing construction work."

Andrews, Harris, and Malone were indicted on February 20, 2004.  The grand jury returned a Second Superseding Indictment ("Second Superseding Indictment" or "Indictment") on June 10, 2004, which charged Andrews with one count of conspiracy, in violation of 18 U.S.C. § 371 (Count One), four counts of wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2 (Counts Two through Five), one count of program fraud, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2 (Count Six), one count of fraudulent

claims upon the Government of the Virgin Islands, in violation of 14 V.I.C. § 843(4) (Count Seven), and one count of inducing a conflict of interest, in violation of 3 V.I.C. §§ 1102, 1103, and 1107 (Count Eight). Harris pled guilty, and Malone and Andrews went to trial. They were initially tried on the charges in the Second Superseding Indictment in May 2006, but the jury was unable to reach a verdict. They were re-tried beginning in August 2006, and on September 20, 2006, the jury convicted Andrews on all charges. On January 19, 2011, the District Court sentenced Andrews to 151 months' imprisonment on Counts One through Six, to be followed by three years of supervised release.[1] The District Court also imposed a $17,500 fine. The District Court sentenced Andrews to two years' imprisonment on Counts Seven and Eight, to be served concurrently with the sentence on Counts One through Six. Andrews filed a timely notice of appeal.[2]

---

[1] It is not clear from the record why nearly five years passed between Andrews's conviction and the imposition of his sentence.

[2] Andrews first filed his notice of appeal on January 26, 2011, but the District Court did not enter a written judgment until March 3, 2011. Pursuant to Federal Rule of Appellate Procedure 4(b)(2), we treat the notice of appeal as filed on the date that the District Court entered its judgment.

On appeal, Andrews raises three arguments. First, he argues that after the Supreme Court's decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010), the District Court's instruction to the jury on honest services fraud under 18 U.S.C. § 1346 was erroneous, and prejudice from the error spilled over to the other charges against him. Second, he contends that the evidence was insufficient to sustain his convictions for wire fraud (Counts Two through Five), program fraud (Count Six), and inducing a conflict of interest (Count Eight). Finally, Andrews maintains that the District Court improperly instructed the jury on Count Seven.[3]

---

In April 2011, Andrews filed a motion for release pending appeal, in which he argued that his appeal raised several substantial questions of law, likely to result in reversal of his conviction, a new trial, a noncustodial sentence, or a shorter term of imprisonment. On September 6, 2011, the District Court denied his motion. *United States v. Andrews*, No. 04-38-2, 2011 WL 3903229, at *5 (D.V.I. Sept. 6, 2011).

[3] The Government noted in its brief that the District Court erred in imposing a "general sentence" of 151 months' imprisonment on Counts One through Six. Andrews did not properly raise this issue in his opening brief, and ordinarily we would consider it waived. *United States v. Albertson*, 645 F.3d 191, 195 (3d Cir. 2005); *see* Fed. R. App. P. 28(a)(5); Third Circuit L.A.P. 28.1(a)(1). However, because we believe that this case presents "extraordinary circumstances," we will consider the legality of the sentence imposed by the District Court. *See Albertson*, 645 F.3d at 195.

## II.

The District Court had jurisdiction under 48 U.S.C. § 1612 and 18 U.S.C. § 3231, and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291. Where there were no legal grounds for challenging an instruction at the time it was given, but such grounds have arisen, due to the articulation of a new rule of law between the time of conviction and the time of appeal, we review for plain error. *Johnson v. United States*, 520 U.S. 461, 464-68 (1997); *United States v. West Indies Transp., Inc.*, 127 F.3d 299, 305 (3d Cir. 1997). Accordingly, we review Andrews's challenge to the honest services fraud portion of the jury instructions for plain error. *United States v. Riley*, 621 F.3d 312, 321-22 (3d

Cir. 2010).[4]  We also review his challenge to the jury instruction on Count Seven for plain error.  Under plain error review, we may correct an error not raised at trial only if the appellant demonstrates that:  (1) there was an error; (2) the error is clear or obvious; and (3) "the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings.'"  *Id.* at 322 (quoting *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010)).  "If all three conditions are met, an appellate court may then exercise its discretion to

---

[4] The Government argues that Andrews waived his right to challenge the jury instructions on appeal because his attorney objected to the initial instruction and persuaded the District Court to provide a clarifying instruction.  Under the "invited error" doctrine, where a defendant makes a request in favor of certain instructions, he waives the right to complain of error in such instructions on appeal.  *United States v. Ozcelik*, 527 F.3d 88, 97 n.6 (3d Cir. 2008); *United States v. Console*, 13 F.3d 641, 660 (3d Cir. 1993).  However, we have previously held that "[w]here a defendant submits proposed jury instructions in reliance on current law" and while his case is on direct appeal, the law is found to be constitutionally problematic, we will not apply the "invited error" doctrine. *United States v. West Indies Transp., Inc.*, 127 F.3d 299, 305 (3d Cir. 1997).  Instead, we review for plain error.  *Id.*  This is consistent with the Supreme Court's definition of waiver as the "intentional relinquishment or abandonment of *a known right*."  *United States v. Olano*, 507 U.S. 725, 733 (1993) (emphasis added) (citations omitted).

notice a forfeited error, but only if . . . the error seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings." *Johnson*, 520 U.S. at 467 (internal marks and citations omitted). Andrews bears the burden of showing that the error affected his substantial rights. *United States v. Olano*, 507 U.S. 725, 734 (1993).

"In reviewing a challenge to the sufficiency of the evidence, we apply a particularly deferential standard of review." *United States v. Reyeros*, 537 F.3d 270, 277 (3d Cir. 2008) (internal marks and citations omitted). We must "view the evidence in the light most favorable to the Government and sustain the verdict if any rational juror could have found the elements of the crime beyond a reasonable doubt." *Id.* (internal marks and citation omitted).

III.

A.

Andrews first contends that references to honest services fraud in the Second Superseding Indictment and in the District Court's instructions to the jury constituted reversible error. We disagree. As we explain below, although *Skilling* rendered the jury instructions improper, the error did not affect Andrews's substantial rights, and thus does not require reversal.

To prove wire fraud, the Government must establish "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of . . . interstate wire communications

12

in furtherance of the scheme." *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001) (citation omitted), *abrogated on other grounds* by *Skilling v. United States*, 130 S. Ct. 2896 (2010). Under 18 U.S.C. § 1346, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." In *Skilling*, the Supreme Court considered the scope and constitutionality of § 1346, and held that the statute criminalizes only "fraudulent schemes to deprive another of honest services through bribes or kickbacks." 130 S. Ct. at 2928, 2931. The Court rejected an argument by the government that § 1346 also covers "undisclosed self-dealing by a public official . . . [such as] the taking of official action by the [official] that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 2932. Such an interpretation, the Court explained, would render the statute unconstitutionally vague. *Id.* at 2931. Accordingly, a district court's failure to limit honest services fraud to schemes involving bribes or kickbacks now constitutes legal error. *Riley*, 621 F.3d at 323.[5]

---

[5] Although *Skilling v. United States*, 130 S. Ct. 2896 (2010), was decided after Andrews's trial and thus was unavailable to the District Court, we apply it retroactively. *United States v. Riley*, 621 F.3d 312, 320 n.9 (3d Cir. 2010); *see Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which

13

1.

The first step in our plain error analysis requires us to determine whether references to honest services fraud in the Indictment and in the District Court's instructions constituted *Skilling* error.[6] The Government concedes that the original version of the Indictment explicitly charged Andrews with honest services fraud. The conspiracy count (Count One) alleged that Andrews "knowingly devise[d] a scheme and artifice to defraud and for obtaining money and property and to deprive another of the intangible right of honest services." The wire fraud counts (Counts Two through Five) alleged that Andrews "deprive[d] another of the intangible right of honest services" and "defraud[ed] the Virgin Islands government and its residents of honest services." The Government pursued both theories at trial, and in his closing argument, the prosecutor explained that the Government's "alternative theory [was that] the scheme and artifice to defraud included the deprival of the Government and the people of the Virgin Islands of the honest services of Ohanio Harris."

However, the Government emphasizes that the Indictment was redacted before the jury was charged, and all references to "honest services" in the wire fraud counts were

---

the new rule constitutes a 'clear break' with the past.").

[6] Because Andrews was tried and convicted before *Skilling*, there is no dispute that no instruction was given limiting 18 U.S.C. § 1346 to bribes and kickbacks.

removed.[7]   The Government further notes that the District Court charged the jury consistent with the redacted version of the Indictment; in explaining the elements of wire fraud to the jury, the District Court did not mention "honest services," and stated that the first element of the wire fraud counts required proof "[t]hat the defendant knowingly devised or participated in a scheme to defraud, or *to obtain money or property* by materially false or fraudulent pretenses, representations, promises or omissions." (emphasis added).  Accordingly, the Government argues that Andrews was charged only with tangible rights wire fraud, that is, a scheme or artifice to fraudulently obtain money or property from the GVI, and thus, there was no *Skilling* error.  We disagree.

Although the District Court may have intended to narrow the Indictment to remove the honest services fraud theory, there were sufficient references to "honest services" in the redacted version of the Indictment and in the District Court's jury instructions to lead a jury to believe that Andrews was charged with honest services fraud.  First, the "Introduction" section of the redacted Indictment stated that "Ohanio Harris had a duty to uphold the laws of the United States and the Virgin Islands; and *to provide honest services*

---

[7] On September 15, 2006, the District Court asked the Government to provide a redacted copy of the Indictment, but it is unclear from the record why the honest services theory was removed.  The District Court told the jury simply that "[the Indictment] says 'redacted' on it.  That just means it's something that I have done in order to make this read consistent with the evidence that's in the box."

15

*to the people of the Virgin Islands*." (emphasis added). Although the Government removed references to "honest services" in the substantive portions of the conspiracy and wire fraud counts, after describing the basis for the wire fraud charges, the Indictment charged Andrews with the violation of § 1346, the honest services fraud statute, when it stated, "[a]ll in violation of Title 18, United States Code, Sections 1343, *1346* and 2." (emphasis added). Second, in its verbal charge to the jury, the District Court referred several times to "honest services" and "honest services fraud." During the introductory portion of the instruction, the District Court stated, "[t]he federal claims in this case . . . all relate to claims of fraudulent intent or attempts to corruptly deprive the Government of the Virgin Islands of the honest services of an officer or employee of the Government of the Virgin Islands." When discussing the conspiracy charge, the District Court explained that "[t]he claim is that Ohanio Harris and Ashley Andrews conspired to commit honest services fraud or wire fraud and to corruptly solicit, give and accept a thing of value from an agent of the Virgin Islands Government." Several sentences later, the District Court reiterated that

> "the government has to prove beyond a reasonable doubt that the conspiracy or the agreement or understanding described in the indictment, to commit honest services fraud or wire fraud, or to corruptly influence an agent of the Virgin Islands Government, was formed by two or more persons, and was existing at or about the time of the charge in the indictment."

16

Although the District Court made the last two statements when discussing the conspiracy charge, a jury could certainly have understood them as references to Counts Two through Five, because the conspiracy count essentially charged the defendants with conspiracy to commit Counts Two through Five.[8] As such, we cannot agree with the Government that there was no *Skilling* error in this case.

The Government points out that after Andrews's attorney objected to language in the initial instruction, the District Court provided a clarifying instruction, explaining that the jury was obligated to consider the charges as they were presented in the Indictment. Because the substantive allegations in the Indictment contained no references to honest services fraud, the Government contends, this additional instruction was sufficient to cure any error in the District Court's previous instructions. We disagree. Although a narrowing instruction may be sufficient to withdraw a previously-given instruction, *see Whitney v. Horn*, 280 F.3d 240, 255-56 (3d Cir. 2002), the additional instruction provided here was not. The District Court did not specifically address the honest services language that it had used, nor did it mention anything about removing 18 U.S.C. § 1346, which was mentioned in the Indictment, from the jury's

---

[8] It is important to note that despite these references to honest services fraud in the conspiracy instructions, Andrews does not argue that *Skilling* invalidated his conspiracy conviction, at least not directly. He does, however, raise a prejudicial spillover challenge to the conspiracy count, which we will address later.

consideration. Rather, the District Court issued the clarifying instruction in response to an objection to its earlier instruction that "[w]hat must be proved beyond a reasonable doubt is that the defendant knowingly participated in the scheme to defraud, a scheme that is substantially the same as the one alleged in the indictment." Andrews's counsel argued that the jury was required to find a scheme that was "exactly the same" as the scheme charged in the Indictment, not one that was "substantially the same." The District Court agreed that its language was potentially misleading, and re-instructed the jury as follows:

> "With respect to the wire fraud counts, I think I charged you that the government had the burden of proving beyond a reasonable doubt that the scheme existed as it was charged in the indictment, or a scheme that was substantially the same as that charged in the indictment. And I think you'll see the words 'substantially the same,' . . . in your instructions. . . . You are instructed to disregard 'substantially the same.' What has to be proven is the scheme alleged in the indictment. . . . It is, as I told you, the government's obligation to prove what is charged in the indictment in Counts 2 through 5. It is that simple. The scheme there is to, as alleged, to defraud the Government of the Virgin Islands; not just a scheme, but a scheme to defraud the Government of the Virgin Islands, as charged in the indictment."

18

Although this instruction clarified that the jury must consider only the scheme charged in the Indictment, the Indictment itself charged Andrews with violating 18 U.S.C. § 1346, the honest services fraud statute. Moreover, in the absence of an instruction specifically telling the jury to disregard all previous references to honest services fraud, we do not believe that the narrowing instruction provided by the District Court was sufficient to remove the taint of the previous instructions.[9]

2.

Having concluded that the first prong of the plain error test is met, we likewise conclude that the second prong is met. Although there was no plain error in the District Court's instructions at the time of trial, the error became apparent when the Supreme Court in *Skilling* limited honest services fraud to bribes and kickbacks. *See United States v. Retos*, 25 F.3d 1220, 1230 (3d Cir. 1994) (explaining that an error is plain "where the error was unclear at the time of trial but

_____

[9] We also note that the Presentence Investigation Report listed the statutes violated as 18 U.S.C. §§ 1343, 1346, and 2 and stated that Andrews was charged with "knowingly devis[ing] a scheme and artifice to defraud and for obtaining money and property and to deprive another of the intangible right of honest services." Although this is not dispositive, and the Probation Officer certainly could have been mistaken as to what was ultimately charged in the redacted Indictment, it suggests that, at the very least, there was confusion as to whether Andrews was charged with honest services fraud.

becomes clear on appeal because the applicable law has been clarified" (quoting *Olano*, 507 U.S. at 734)).

3.

We turn now to the third step of our inquiry, which requires us to determine whether the error affected Andrews's substantial rights, "which in the ordinary case means [whether] it affected the outcome of the district court proceedings." *Marcus*, 130 S. Ct. at 2164 (internal marks and citations omitted). In other words, we must determine whether the error was harmless. *Id.* (citing *Olano*, 507 U.S. at 734-35). Under plain error review, a defendant bears the burden of demonstrating that the error was not harmless, i.e., that there is "a reasonable probability that the error affected the outcome of the trial." *Olano*, 507 U.S. at 734.[10] We

---

[10] There is a narrow category of cases involving "structural errors," which affect the "framework within which the trial proceeds." *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010) (citing *Johnson v. United States*, 520 U.S. 461, 468 (1997)). The Supreme Court has left open the possibility that in cases involving "structural errors," the defendant need not demonstrate that the error impacted the outcome of the trial. *Id.* at 2164-65. However, *Skilling* error is not "structural" and thus, Andrews bears the burden of demonstrating that the error was not harmless. *See Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam) (holding that no "structural error" occurs where a jury is instructed on alternative theories of guilt, and the defendant alleges that the jury relied on an invalid theory); *United States v. Skilling* (Skilling II), 638 F.3d 480, 483 (5th Cir. 2011).

conclude that Andrews has not met that burden because: (1) he has not established a reasonable probability that he would have been acquitted of tangible wire fraud absent the *Skilling* error, and alternatively (2) he cannot demonstrate that the jury would not have convicted him of honest services fraud had it been instructed that the fraudulent scheme must involve bribery or kickbacks.

First, we find that, irrespective of the error, Andrews still would have been convicted of wire fraud (Counts Two through Five) on the valid theory of tangible rights fraud under 18 U.S.C. § 1343.[11] Where there is a clear alternative theory of guilt, supported by overwhelming evidence, a defendant likely cannot show that an instruction permitting the jury to convict on an improper basis was not harmless error. *See United States v. Skilling* (Skilling II), 638 F.3d 480, 482 (5th Cir. 2011); *United States v. Black* (Black II), 625 F.3d 386, 388, 392-94 (7th Cir. 2010); *see also Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (per curiam) (explaining that an instructional error may be harmless "so long as the error at issue does not categorically vitiate *all* the jury's findings" and that "[a]n instructional error arising in the context of multiple theories of guilt no more vitiates *all* the jury's findings than does omission or misstatement of an element of the offense when only one theory is submitted") (internal marks and citations omitted). In contrast, where

---

[11] Because the jury returned a general verdict, we cannot say definitively which of the Government's theories the jury actually relied on to convict Andrews on Counts Two through Five.

21

evidence on the valid alternative theory is relatively weak, the government relies heavily on the improper theory, and the district court's instructions on the improper theory are "interwoven" throughout the jury charge, the instructional error will not be harmless. *See United States v. Wright*, 665 F.3d 560, 572 (3d Cir. 2012); *Riley*, 621 F.3d at 324; *United States v. Hornsby*, 666 F.3d 296, 305-07 (4th Cir. 2012). In this case, the Government presented overwhelming evidence that Andrews committed tangible wire fraud and although the District Court referred to "honest services" on several occasions in its final instructions, the District Court did not define honest services fraud, nor were the references to "honest services" interwoven throughout the jury charge.

Because the determination as to whether an instructional error was harmless depends significantly on the context in which the instruction was provided and the other evidence presented at trial, we will review in some detail the other cases that have addressed whether a *Skilling* error was harmless. We first examine the cases in which courts have found *Skilling* instructional error to be harmless. In *Skilling*, Skilling was charged with, among other things, conspiracy. 130 S. Ct. at 2908. The indictment alleged several possible objects of the conspiracy, including securities fraud and honest services fraud. *Id.* Although it held that the honest services theory was improper, the Court remanded to the U.S. Court of Appeals for the Sixth Circuit to determine whether the error was harmless. *Id.* at 2934. In *Skilling II*, on remand, the Sixth Circuit held that the district court's instruction that the jury could convict on either theory was harmless, even though the jury returned a general verdict on the conspiracy

22

charge without identifying the specific object of the conspiracy. 638 F.3d at 481, 483-84. The Sixth Circuit concluded that because the evidence at trial overwhelmingly proved conspiracy to commit securities fraud, the verdict on the conspiracy charge would have been the same absent the erroneous instruction on honest services fraud. *Id.* at 483-84, 488. The court also noted that the indictment "focused primarily" on securities fraud, and the government only mentioned the honest services theory in relation to Skilling once during its closing argument. *Id.* at 483 & n.3.[12]

Similarly, in *United States v. Black (Black II)*, 625 F.3d at 392-93, on remand from the Supreme Court in *Black v. United States*, 130 S. Ct. 2963 (2010), the U.S. Court of Appeals for the Seventh Circuit held that the district court's *Skilling* error was partially harmless. In that case, the defendants were charged with two counts of fraud. *Black II*, 625 F.3d at 388. For both counts, the jury was instructed on two alternative theories: (1) a scheme to fraudulently appropriate money from the company of which the defendants were executives (pecuniary fraud), and (2) a scheme to deprive the company of their "intangible right of honest services." *Id.* The Seventh Circuit explained that although the honest services instruction was improper after *Skilling*, "if it [was] not open to reasonable doubt that a reasonable jury would have convicted [the defendants] of pecuniary fraud, the convictions on the fraud counts [would]

---

[12] The government did, however, rely heavily on the honest services theory in relation to Skilling's co-defendant, Kenneth Lay. *Skilling II*, 638 F.3d at 483.

stand." *Id.* (citations omitted). The court explained that the evidence was sufficient to prove pecuniary fraud on both counts and the jury was correctly instructed on the elements of pecuniary fraud. *Id.* at 391. However, in light of the *Skilling* error, "the question [was] . . . whether a reasonable jury might have convicted the defendants of [honest services fraud] but not have convicted them of pecuniary fraud." *Id.* at 392. The Seventh Circuit reached a different answer to this question for each of the two counts based on the factual distinctions between the respective schemes to defraud. As to the first count, the court found that the government made out "a solid honest-services case . . . but not a solid pecuniary-fraud case," and thus, it was impossible to say with certainty that the jury did not convict solely on the basis of the honest services theory. *Id.* However, the court upheld the defendants' conviction on the second count, reasoning that "the evidence of pecuniary fraud [was] so compelling that no reasonable jury could have refused to convict [them] of it." *Id.* at 393. In reaching this conclusion, the court noted that the basis for the honest services fraud conviction was "mentioned in passing in the information, but the evidence at trial, and the closing arguments, focused on whether [certain acts were] merely an oversight or instead proof of pecuniary fraud." *Id.*

In contrast, in *United States v. Riley*, 621 F.3d at 324, *United States v. Wright*, 665 F.3d at 571, and *United States v. Hornsby*, 666 F.3d at 307, the improper honest services instructions were found to be reversible error. In *Riley*, the defendants were charged with three counts of mail fraud under 18 U.S.C. §§ 1341 and 2, based on a scheme to

24

fraudulently convey city-owned property, one count of program fraud under 18 U.S.C. § 666(a)(1)(A), stemming from the fraudulent sales of the property, and one count of conspiracy to defraud the public of a codefendant's honest services, in violation of 18 U.S.C. §§ 1341, 1346, and 371. 621 F.3d at 317. As an introduction to the conspiracy charge, the district court told the jury that "honest services . . . fraud does not require a scheme to defraud another to obtain money or property" and could instead be based on the violation of "a duty of honest, faithful and disinterested service to the public and that official's public employer." *Id.* at 323 n.15. The district court then explained that the jury could convict on the conspiracy charge if it found that the public official codefendant, Sharpe James, breached one or more of the following duties of honest services that he owed to the State of New Jersey and the City of Newark:[13] (1) "knowingly committing acts related to his official positions that were unauthorized exercises of his official functions for the purpose of obtaining and receiving money and benefits for himself and others from the governments that he represented"; (2) "as part of his fiduciary duty and his obligation pursuant to the circumstances set forth in [18 U.S.C.] § 666(a)(1)(A), to refrain from stealing, taking by fraud, misapplying and misappropriating the assets of his public employers"; or (3) "as part of his fiduciary duty, to disclose conflicts of interest to his public employers in

---

[13] James served as both the Mayor of Newark, New Jersey, and as a New Jersey State Senator. *Riley*, 621 F.3d at 318.

25

official matters over which [he] exercised, and attempted to exercise, official authority and discretion, and to recuse himself where he had such conflicts of interest." *Id.* at 322.

The government argued that because the first two alternative theories of duty were valid bases for finding a conspiracy, the district court's improper instruction on the third basis did not affect the defendants' substantial rights. *Id.* at 323-24. We disagreed, reasoning that although the jury convicted James of a substantive violation referred to in one of the alternative descriptions of duty, program fraud under § 666(a)(1)(A), the erroneous description of honest services fraud was at the "heart" of the conspiracy charge and "interwoven throughout the . . . charge." *Id.* at 324. We further observed that "[t]he very title of [the conspiracy count], 'Conspiracy to Use the U.S. Mail to Defraud the Public of Defendant James's Honest Services,' invite[d] the application of the [d]istrict [c]ourt's charge to the jury regarding honest services fraud to the entire count." *Id.* Moreover, the conspiracy instructions "began with an over-arching umbrella description of James's fiduciary duty as a public official, which included the now-erroneous honest services definition." *Id.* We also noted that the government focused on the non-disclosure of a conflict of interest and that the conflict-of-interest theory was "pervasive . . . throughout th[e] case." *Id.* at 324, 325. Thus, we rejected the government's argument that a jury would have viewed the three theories in the conspiracy instruction as alternative forms of conspiracy liability, separate and distinct from James's violation of his honest services obligations, because the district court did not make such a distinction clear. *Id.* at

26

324. We concluded that the "defendants ha[d] met their burden of showing a reasonable probability that the jury utilized the broad definition of an honest services violation given in connection with the entire conspiracy charge." *Id.*

We reached a similar conclusion in *Wright*. In that case, the defendants were charged with honest services fraud, "traditional" mail fraud, and conspiracy. 665 F.3d at 564-65. The district court instructed the jury that it could convict for honest services fraud under either a "conflict of interest" theory or a "bribery" theory. *Id.* at 567. We held that the improper conflict-of-interest instruction was not harmless because there was "ample evidence on which the jury could have convicted [the defendants] under [the conflict of interest] theory" and "the evidence supporting the bribery theory, while sufficient, [was] less than . . . 'overwhelming.'" *Id.* at 571 (citation omitted). We explained that, based on the evidence, the jury may have drawn inferences about the defendants' intent that would not support a bribery theory. *Id.* We also noted that the "trial environment . . . emphasized the conflict-of-interest theory" and the jury instructions devoted "about eight times more words to the conflict-of-interest theory than they did to the bribery theory." *Id.* at 572.

Likewise, in *Hornsby*, the U.S. Court of Appeals for the Fourth Circuit held that a district court's instruction that a jury could convict the defendant of honest services fraud on a conflict-of-interest theory was not harmless. 666 F.3d at 307. In instructing the jury on the honest services fraud counts, the district court explained that the jury need not consider whether the defendant received a financial benefit from a third party as part of the scheme to defraud; rather, the court

27

told the jury that it could convict if it found that the defendant "fail[ed] to disclose a personal interest in a matter over which [he had] decision-making power." *Id.* at 306. The district court further stated that a "public official's duty and honesty includes the duty to disclose . . . a personal conflict of interest" and that the "failure to disclose . . . may . . . constitute a fraudulent representation." *Id.* In finding that the improper instruction was not harmless, the Fourth Circuit observed that the conflict-of-interest language was "interwoven" through the honest-services instruction. *Id.* (citing *Riley*, 621 F.3d at 324). Moreover, the court noted, the government presented strong evidence to support the conflict-of-interest theory and emphasized in its closing argument that "the defendant's crime in this case is fraudulently participating in decisions where his business partner and his girlfriend had a stake and concealing it from the board." *Id.* at 306-07. Thus, although the facts arguably showed that the defendant also received a kickback, based on the nature of the jury instructions and the emphasis placed on the conflict-of-interest theory, the Fourth Circuit held that it could not be certain whether the jury relied on a conflict-of-interest theory or a kickbacks theory. *Id.* at 307.

Our case is distinguishable from those in which courts have determined that *Skilling* instructional error was not harmless. First, as in *Skilling II*, 638 F.3d at 483-84, and *Black II*, 625 F.3d at 393, the Government presented overwhelming evidence of tangible rights (pecuniary) fraud. The testimony conclusively established that the object of Andrews's fraudulent scheme was a tangible asset, that is, a multi-million dollar sewer repair contract from the GVI.

28

Although the evidence also showed a scheme to defraud the GVI of Harris's honest services, the evidence of pecuniary fraud was so compelling that no reasonable jury could have refused to convict Andrews on that theory.

Second, not only were the references to honest services fraud not "interwoven" throughout the jury charge, the District Court never explicitly instructed the jury on the elements of honest services fraud at all. *Cf. Hornsby*, 666 F.3d at 306; *Riley*, 621 F.3d at 324. In contrast, the District Court did properly instruct the jury on the elements of tangible rights fraud. In reference to Counts Two through Five, the District Court stated:

> "So the government has to prove beyond a reasonable doubt three essential elements. That the defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by materially false or fraudulent pretenses, representations, promises or omissions. . . . So the first element the government has to prove . . . is that there was a scheme to defraud. So the scheme to defraud is any deliberate plan of action or course of action by which someone intends to deceive or to cheat another, or by which someone intends to deprive another of something of value. . . . Federal law protects money and property interests. Money or property interests are commonly referred to as tangible rights, because those are things that you can touch and feel. They include, money, real property and

29

specific goods and property, goods or possessions."

The District Court further charged the jury that it was to consider only the scheme to defraud that was charged in the Indictment. The description in Counts Two through Five of the Indictment of the "scheme to defraud" never mentions "honest services" or "honest services fraud." It does, however, set forth in detail Andrews's scheme to fraudulently obtain the sewer repair contract, a tangible asset. Specifically, the Indictment alleges:

> "Beginning in or about December, 2000, and continuing up to at least the Fall of 2003, in St. Thomas and St. Croix, within the District of the Virgin Islands and elsewhere, the defendants Ashley Andrews, Campbell Malone, and others . . . devised a scheme and artifice to obtain money by means of material false and fraudulent pretenses and representations, omissions and concealment of material facts, which involved securing a no-bid contract for sewer repair work and generating a fraudulent claim for expenses incurred as a result of preparing a proposal for a contract to repair the St. Croix sewer system. . . . It was a part of the scheme and artifice to obtain money and property and to defraud the Virgin Islands government."

Moreover, in contrast to *Riley*, 621 F.3d at 324, the title of the challenged counts (Counts Two through Five) does

not mention "honest services." In fact, the title does not even cite § 1346, but refers only to § 1343; the title reads: "Counts 2 Through 5, 18 U.S.C. § 1343 (Wire Fraud)." Thus, although the District Court referred to "honest services" three times in its final charge, the Indictment, which the jurors were explicitly instructed to follow, did not "invite[] the application" of the honest services language to Counts Two through Five. *Compare Riley*, 621 F.3d at 324, *with Skilling II*, 638 F.3d at 483 n.3 (noting that the indictment "focused primarily" on securities fraud), *and Black II*, 625 F.3d at 393 (stating that the basis for the honest services theory was mentioned in the information only "in passing").[14] Furthermore, unlike in *Riley*, 621 F.3d at 324, where the improper conflict-of-interest theory went to the "heart" of the instructions, and *Wright*, 665 F.3d at 572, where the jury instructions devoted eight times more words to the improper theory, the District Court in this case made only a few passing references to "honest services" while discussing the conspiracy count. Given that the District Court explicitly instructed the jury that it had to find the elements of tangible rights fraud beyond a reasonable doubt, and we presume that juries follow their instructions regarding a count in returning a verdict on that count, *Bronshtein v. Horn*, 404 F.3d 700,

---

[14] The only language in the Indictment that could be interpreted as referring to honest services fraud was located in the "Introduction" section and stated: "Ohanio Harris had a duty to uphold the laws of the United States and the Virgin Islands; and to provide honest services to the people of the Virgin Islands."

31

713-14 (3d Cir. 2005), Andrews cannot establish a "reasonable probability," *Marcus*, 130 S. Ct. at 2164, that the passing references to "honest services" affected the jury's verdict on Counts Two through Five. Admittedly, the District Court's statement that "[t]he federal claims in this case . . . all relate to claims of fraudulent intent or attempts to corruptly deprive the Government of the Virgin Islands of the honest services of an officer or employee of the Government of the Virgin Islands" is somewhat troubling. However, in contrast to the "umbrella" statement in *Riley*, the District Court's broad statement in this case was not followed by a further explanation of "honest services." *Cf. Riley*, 621 F.3d at 324.[15]

---

[15] It is worth noting that there is another difference between our case and *United States v. Wright*, 665 F.3d 560 (3d Cir. 2012). In *Wright*, the defendants objected to the honest services charge at trial and thus preserved the issue for review. *Id.* at 570-71. In such a situation, harmless error review requires the government to "prove[] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 570 (quoting *United States v. Waller*, 654 F.3d 430, 434 (3d Cir. 2011)). In contrast, when we review for plain error, the defendant bears the burden of establishing that the error affected his substantial rights, which requires him to show that there is "a reasonable probability that the error affected the outcome of the trial." *Olano*, 507 U.S. at 734. Thus, Andrews faces a more difficult challenge in demonstrating reversible error than did the defendants in *Wright*.

32

Alternatively, even if Andrews could show that a reasonable jury might not have convicted him of tangible wire fraud absent the *Skilling* error, he still cannot demonstrate that the error affected his substantial rights because any reasonable jury would have found all of the elements of post-*Skilling* honest services fraud beyond a reasonable doubt had it been instructed that the fraudulent scheme must involve bribery or kickbacks. A district court's failure to instruct the jury on an element of the offense will be harmless error if, based on the evidence, no reasonable jury could find that the element was not present. *Neder v. United States*, 527 U.S. 1, 18-19 (1999). However, if the record contains "evidence that could rationally lead to a contrary finding with respect to the omitted element," the error is not harmless. *Id.* at 19. Here, although the jury was not instructed that § 1346 was limited to bribes and kickbacks, the Government proved beyond a reasonable doubt that the fraudulent scheme involved bribery.

A bribery theory under § 1346 "requires a *quid pro quo*," *Wright*, 665 F.3d at 567 (quoting *United States v. Kemp*, 500 F.3d 257, 281 (3d Cir. 2007)), that is, "a specific intent to give or receive something of value *in exchange* for an official act," *id.* at 567-68 (quoting *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05 (1999)). "[A] bribery theory does not require that each *quid*, or item of value, be linked to a specific *quo*, or official act. Rather, a bribe may come in the form of a 'stream of benefits.'" *Id.* at 568 (quoting *United States v. Bryant*, 655 F.3d 232, 240-41 (3d Cir. 2011)). An honest services fraud prosecution for bribery after *Skilling* thus requires the Government to prove: (1) that "the payor provided a benefit to a public official

intending that he w[ould] thereby take favorable official acts that he would not otherwise take," and (2) that "the official accepted those benefits intending, in exchange for the benefits, to take official acts to benefit the payor." *Id.* (citations omitted). "The *quid pro quo* can be implicit, that is, a conviction can occur if the Government shows that [the official] accepted payments or other consideration with the implied understanding that he would perform or not perform an act in his official capacity." *Id.* (quoting *Antico*, 275 F.3d at 257).

Here, not only did the Government allege that Andrews committed bribery; the jury actually convicted him of bribery, albeit under a different statute, 18 U.S.C. § 666(a)(2). *Cf. Skilling*, 130 S. Ct. at 2934 (stating that Skilling's conduct did not violate the narrowed version of the statute because the government "did not, at any time, allege that Skilling solicited or accepted side payments from a third party in exchange for making . . . misrepresentations"). We have never decided whether § 666(a)(2) requires proof of a *quid pro quo*, and therefore whether § 666 bribery is the same as § 1346 bribery. *See Bryant*, 655 F.3d at 246 n.16. However, we need not decide that question today because the District Court's jury instruction required the jury to find a *quid pro quo* exchange in this case. At the close of trial, the District Court instructed the jury that as to Count Six:

> [t]he government has to prove beyond a reasonable doubt that there was action by Ashley Andrews to corruptly attempt to influence Ohanio Harris, knowing that he was an agent of the Government of the Virgin

34

Islands, for the purpose of causing him to use his position or abuse his position for the benefit of Ashley Andrews or GRM relative to obtaining the sewer contract.

Thus, to convict Andrews on Count Six, the jury was required to find, as it would be under § 1346, that Andrews gave Harris a thing of value (the *quid*) in exchange for Harris performing acts in his official capacity favorable to Andrews and GRM related to the sewer repair contract (the *quo*). Given that the jury convicted Andrews on Count Six, no rational jury could have then failed to find that the fraudulent scheme alleged in Counts Two through Five involved bribery.

In sum, because Andrews has not shown a "reasonable probability that the [*Skilling*] error affected the outcome of the trial," *Olano*, 507 U.S. at 734, we hold that there was no plain error as to Counts Two through Five.[16] We necessarily also conclude that there was no prejudicial spillover into the remaining counts. "When two charges are closely linked and we vacate [or reverse] a conviction on one of them, we must ensure that the error on the vacated [or reversed] charge has not affected the remaining charge." *Wright*, 665 F.3d at 575. Here, because we have determined that the District Court's

---

[16] Because we find that Andrews has failed to satisfy the third prong of the plain error test, we need not consider the fourth prong, whether "the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Riley*, 621 F.3d at 322 (quoting *Johnson*, 520 U.S. at 467).

*Skilling* error was harmless (i.e., not prejudicial), *see Marcus*, 130 S. Ct. at 2164, and thus did not require vacatur or reversal of Andrews's convictions on Counts Two through Five, there was no prejudicial spillover to the remaining counts.[17]

### B.

Andrews next argues that the evidence was insufficient to support his convictions for wire fraud, program fraud, and inducing a conflict of interest. We will address his arguments as to each offense in turn.

---

[17] Given that our conclusion that the *Skilling* error was harmless was based, in part, on the fact that the jury convicted Andrews of bribery under 18 U.S.C. § 666(a)(2), we acknowledge the potential for a circularity problem. In some instances, it may be problematic to look to a defendant's conviction on one count and conclude that an error as to another count was harmless, because there is the possibility that prejudice from the error spilled over and led to the conviction on the other count. However, in this case, the Government presented such strong evidence that Andrews committed bribery under § 666(a)(2) that we do not hesitate to find that Andrews's conviction on Count Six was wholly unaffected by the *Skilling* error. *See Black II*, 625 F.3d at 390 (rejecting the defendant's argument that prejudice from the erroneous honest services instruction spilled over to an obstruction of justice count because the evidence of obstruction was "very strong" and "[n]o reasonable jury could have acquitted [the defendant] of obstruction if only it had not been instructed on honest-services fraud").

36

1.

To obtain a conviction for wire fraud under 18 U.S.C. § 1343, the Government must prove "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of . . . interstate wire communications in furtherance of the scheme." *Antico*, 275 F.3d at 261 (citation omitted). Here, the Government presented sufficient evidence to allow a rational jury to find these elements beyond a reasonable doubt. *See Reyeros*, 537 F.3d at 277. Andrews's contentions to the contrary are unavailing.

Andrews first alleges that the evidence on the wire fraud counts was insufficient because, although he asked Price to send bond documentation to Malone, he never asked Price to use interstate wire communications (i.e., fax or email). However, the statute does not require that the defendant himself sent the communication or that he intended that interstate wire communications would be used. Rather, § 1343 requires that the defendant "knowingly caused" the use of interstate wire communications. *United States v. Bentz*, 21 F.3d 37, 40 (3d Cir. 1994). "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Id.* (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)); *see United States v. Giovengo*, 637 F.2d 941, 944 (3d Cir. 1980) (explaining that "cases construing the mail fraud statute are applicable to the wire fraud statute as well").

In this case, the use of interstate wire communications was reasonably foreseeable. When Andrews asked Price, who was in New York, to send bond application documents to Malone, who was in the Virgin Islands, it was reasonably foreseeable that Price would send the documents via email or fax. Moreover, given the complexity of the bond application process, it was reasonably foreseeable that Price and Malone would exchange multiple emails or faxes.

Andrews also contends that the evidence was insufficient to support his conviction on Count Two specifically because the email transmission alleged in the Indictment never occurred. Count Two of the indictment states that on October 10, 2002, Price sent an email to Malone. The Government acknowledges that no email transmission occurred on this date; rather, as Price testified, the documents sent on October 10 were transmitted via fax. Andrews notes that fax and email are distinct means of communication, and argues that by allowing the Government to proceed on Count Two on the basis that Price sent a fax to Malone, the District Court "constructively amended" the Indictment. We disagree.

"An indictment is constructively amended when evidence, arguments, or the district court's jury instructions, effectively amends the indictment by broadening the possible bases for conviction from that which appeared in the indictment." *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007) (internal marks and citation omitted). A constructive amendment constitutes a "per se" violation of a defendant's Fifth Amendment right to a jury trial. *Id.* (citation omitted). In contrast, a variance occurs "when the

38

charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* at 231 n.7 (internal marks and citation omitted). "If a variance between the indictment and the evidence does not alter the elements of the offense charged, we will focus upon whether or not there has been prejudice to the defendant." *Id.* (internal marks and citations omitted).

Here, the discrepancy between the Indictment and the evidence presented at trial clearly constituted a variance. *See id.* The elements of wire fraud were unaffected; the Indictment simply misstated that the October 10, 2002 transmission was made via email. Andrews suffered no prejudice as a result of this minor variance.

2.

Andrews also argues that there was insufficient evidence to sustain his conviction on Count Six for program fraud. Under 18 U.S.C. § 666(a)(2), the Government must prove that the defendant (1) corruptly gave, offered, or agreed to give anything of value to any person, (2) "with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." Andrews challenges his conviction under § 666(a)(2) on the basis that the Government failed to demonstrate that Harris had the

39

authority to influence the award of the sewer contract. This argument is meritless.[18]

Harris, who qualified as an "agent" under § 666,[19] did not have to possess actual authority over the business, transaction, or series of transactions, that Andrews sought to influence. *See United States v. Vitillo*, 490 F.3d 314, 323 (3d Cir. 2007). Rather, the Government had to prove only that Andrews *intended*, by offering a bribe to Harris, to influence the sewer contract. The Government presented sufficient evidence that Andrews possessed such an intent. Moreover, even if actual ability to influence was required under § 666, Harris had the ability to influence the awarding of the sewer contract, as evidenced by the fact that he did exercise his influence and steer the sewer system repair contract to Andrews and GRM.

---

[18] Andrews raises a similar challenge to his conviction for inducing a conflict of interest under 3 V.I.C. §§ 1102, 1103, and 1107 (Count Eight). We reject this challenge for similar reasons.

[19] Section 666 defines "agent" as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1).

3.

Andrews also contends that the Government failed to present sufficient evidence to prove Count Eight, inducing a conflict of interest. Again, we disagree. Section 1107 of Title 3 of the Virgin Islands Code provides that "[n]o person shall induce or seek to induce any territorial officer or employee to violate [3 V.I.C. § 1102(3)]." Under 3 V.I.C. § 1102(3):

> "[n]o territorial officer or employee shall . . . have any interest, financial or otherwise, direct or indirect, or engaged in any business or transaction or professional activity, or incur any obligation of any nature, which is in substantial conflict with the proper discharge of his duties in the public interest and of his responsibilities as prescribed in the laws of the Virgin Islands."

An officer or employee is deemed to have an interest "in substantial conflict with the proper discharge of his duties" under Virgin Islands law "if he will derive a direct monetary gain or suffer a direct monetary loss . . . by reason of his official activity." 3 V.I.C. § 1103.

The Indictment alleged that Andrews "caused Ohanio Harris to serve as president of GRM and act on behalf of GRM at a time when GRM sought contracts from Ohanio Harris' employer, the [GVI]." Andrews argues that because the Government did not show that GRM would make a profit, it did not prove that Harris "[would] derive monetary gain" from his activities, and therefore did not prove that he had an

41

interest "in substantial conflict" with his professional duties. To the extent that Andrews asks us to read a certainty-of-monetary-gain requirement into the statute, we decline to do so. In enacting Chapter 37, Conflicts of Interest, the Virgin Islands Legislature explained that the purpose of the statute was "to assure the impartiality, and ethical conduct of all involved in governmental transactions and decisions." 3 V.I.C. § 1100. Accordingly, we hold that in a prosecution under 3 V.I.C. §§ 1102(3), 1103, and 1107, the Government need only prove that the "territorial officer or employee" expected to profit from the relationship such that his impartiality as a public official was likely to be affected. Here, Andrews and Harris entered into an arrangement, pursuant to which Harris would, in the future, derive economic benefit from GRM. This expectation was sufficient to establish a conflict of interest under Virgin Islands law. The Government was not required to prove that GRM would be profitable in the future; in fact, we have difficulty envisioning how the Government would even go about doing so.

## C.

We turn now to Andrews's final argument, that the jury was improperly instructed on Count Seven, which alleged fraudulent claims upon the GVI, in violation of 14 V.I.C. § 843(4). Section 843(4) makes it a crime for any individual to "make[] or use[] any false bill, receipt, voucher, roll, account, claim, certificate, affidavit or deposition knowing the same to contain any fraudulent or fictitious statement or entry- in any matter within the jurisdiction of any officer, department, board, commission, or other agency

of the government of the Virgin Islands." Andrews argues that the District Court's final charge to the jury was improper because it did not include a specific instruction that the jury must find the content of the claim false, and that the jury could not convict solely on the basis that Andrews had no contract with the GVI and thus no right to file a claim. However, on the first day of trial, the District Court gave precisely the instruction that Andrews argues was required. The District Court explained to the jury:

> "The Court has ruled that whether there was, in fact, legal authority to file the claim is irrelevant. If one files a claim believing that there – even believing that there is a basis for filing a claim, one has the obligation not to file a false claim. So the issue for the jury to determine, and as charged in the indictment, is whether or not the claim filed was false, and made with fraudulent intent."

Thus, the jury was clearly instructed that regardless of whether Andrews had entered into a valid contract with the GVI and had a right to file a claim for payment, an issue which was subject to dispute, the jury could only convict if it found that Andrews submitted a claim to the GVI, knowing that the claim contained false statements.

Andrews did not request that the District Court repeat this instruction during the final charge. In its final instruction, the District Court stated:

43

"the government has to prove that there was a fraudulent claim submitted, that is, it was done for the purpose of trying to cheat the Government of the Virgin Islands, and that it was done not because of mistake or accident, not in good faith, but it was done with fraudulent intent."

Nothing in this instruction suggested to the jury that it could convict Andrews under 14 V.I.C. § 843(4) if it found that Andrews had no contract with the GVI and thus no right to file a claim. Because we presume that the jury followed the initial instruction, *United States v. Walker*, 657 F.3d 160, 171 (3d Cir. 2011), we conclude that the District Court committed no error in instructing the jury on Count Seven.

IV.

Finally, we address the legality of the sentence imposed by the District Court. The Government noted in its brief that the District Court erred in imposing a "general sentence" on Counts One through Six, instead of specifying an individual sentence for each offense. Andrews did not properly raise this issue in his opening brief, and ordinarily "an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal." *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) (citations omitted). However, the waiver rule yields in "extraordinary circumstances." *United States v. Albertson*, 645 F.3d 191, 195 (3d Cir. 2011). In determining whether a case presents "extraordinary circumstances," we consider three factors: (1) "whether there is some excuse for the

44

[appellant's] failure to raise the issue in the opening brief"; (2) the extent to which the opposing party would be prejudiced by our considering the issue; and (3) "whether failure to consider the argument would lead to a miscarriage of justice or undermine confidence in the judicial system." *Id.* (quoting *In re Kane*, 254 F.3d 325, 331 (1st Cir. 2001)). The miscarriage of justice factor is "somewhat similar to the 'plain error' rule," which allows appellate courts to correct an error not raised before the district court if the error affected the defendant's substantial rights and "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 196 (quoting *Gambino v. Morris*, 134 F.3d 156, 169 n.12 (3d Cir. 1998) (Roth, J., concurring), and *United States v. Knight*, 266 F.3d 203, 207 (3d Cir. 2001)).

Applying these factors to Andrews's case, we believe "the balance weighs in favor of reviewing the merits" of the general sentence issue. *Id.* at 195. With respect to the first factor, Andrews has provided no compelling reason for his failure to raise the issue in his opening brief. Thus, the first factor weighs in favor of waiver. However, the second and third factors weigh heavily against waiver. As to the second factor, it is clear that the Government would suffer no prejudice as a result of our considering the issue because the Government expressly concedes in its brief that remand for "clarification of the sentence" on Counts One through Six is appropriate. Finally, as to the miscarriage of justice factor, we have held, in the context of plain error review, that a general sentence error under the Sentencing Guidelines affects a defendant's "substantial rights and result[s] in manifest injustice because, as a result of the general nature of

45

the sentence, neither we nor [the defendant] can determine whether it was legal as to particular counts." *United States v. Ward*, 626 F.3d 179, 184 (3d Cir. 2010) (citation omitted).

Turning to the merits, we hold that the District Court erred in imposing a general sentence of 151 months' imprisonment on Counts One through Six. Under the Sentencing Guidelines, a district court must impose a sentence on each count. *Ward*, 626 F.3d at 184 (citing U.S.S.G. 5G1.2(b)). Here, although the 151-month term of imprisonment was within the statutory maximum for Counts Two through Five, it exceeded the statutory maximum for Counts One and Six, and due to the general nature of the sentence, we cannot determine whether the sentence was legal as to each count. *See id.* Therefore, we will vacate Andrews's sentence on Counts One through Six, and remand for the limited purpose of allowing the District Court to clarify the sentence imposed on each count of conviction.

## V.

For the foregoing reasons, we will affirm the District Court's judgment of conviction, vacate the judgment of sentence on Counts One through Six, and remand to the District Court for resentencing.