PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-3305 & 19-1011

_____

UNITED STATES OF AMERICA

v.

DAVID T. SHULICK,
                              Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. No. 2-16-cr-00428-001)
District Judge:  Honorable Harvey Bartle, III
_____

Argued December 10, 2020
Before:  MCKEE, PORTER and FISHER, *Circuit Judges*.

(Filed: November 15, 2021)


Hope C. Lefeber
Suite 1205
1500 John F. Kennedy Boulevard

Two Penn Center Plaza
Philadelphia, PA 19102

Lisa A. Mathewson [ARGUED]
Suite 810
123 South Broad Street
Philadelphia, PA 19109
    *Counsel for Appellant*

Michael T. Donovan
Christopher J. Mannion
Robert A. Zauzmer [ARGUED]
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Lawyer and businessman David Shulick owned a for-profit education company through which he contracted with the School District of Philadelphia to run its Southwest School, an institution designed to help some of Philadelphia's most at-risk children. Under the contract, Shulick received over $2 million to provide teachers, counselors, security, and special services to the charter school's students. But instead of spending the money on the students as the contract required, he embezzled funds for his personal benefit and the benefit of his co-conspirator, Chaka Fattah, Jr. After a complex, multi-

2

year fraud investigation, Shulick was ultimately charged and convicted. He now appeals, alleging a number of errors, ranging from speedy trial right violations to errors in evidentiary rulings, faulty jury instructions, and sentencing miscalculations. After careful review of each claim, we conclude there was no reversible error in the proceedings and will therefore affirm.

I.

A. Factual History

Shulick owned and operated Delaware Valley High School Management Corporation (DVHS), a for-profit business which provided alternative education to at-risk students. DVHS's business model was to contract with school districts to handle the operation of their schools.

One of those school districts was the School District of Philadelphia. In early 2010, the School District hired and signed a contract with DVHS and Shulick to operate its Southwest School in Philadelphia, an institution serving at-risk high school students with attendance, behavioral, emotional, and familial issues, including some who had dropped out of school entirely. The contract provided that DVHS would operate Southwest for the 2010-2011 and 2011-2012 school years. The School District set forth a high-level plan for Southwest, dictating the number of students enrolled at the school and the services to be provided to them. Specifically, DVHS had to provide (1) six teachers at a cost of $45,000 each; (2) benefits for the staff at a total cost of $170,000 per year; (3) four security workers totaling $130,000 per year; and (4) a trained counselor and two psychology externs totaling $110,000 per year. The agreement was not flexible as to budgeted items. In a provision titled "*Budget,*" it required DVHS to "carry out the Work and bill the School District

3

strictly in conformity with the Contractor's Budget." App. 4847. Within these parameters, DVHS and Shulick had authority to manage and run the school. Shulick could implement a curriculum and program and could hire and fire staff as he saw fit.

Despite the contract's clear requirements, Shulick failed to provide the services and staff he agreed to. He failed to employ the dedicated security personnel the contract required. He hired fewer teachers, provided those whom he did hire with far fewer benefits than the budget allocated, and paid his educators salaries of only $36,000 a year—$9,000 less than promised. Shulick then reduced their salaries even further if they elected health insurance. He even attempted to lay off teachers at the end of the school year to avoid paying them the final few months of their salaries. Overall, Shulick represented to the School District that he would spend $850,000 on salary and benefits each year but spent under half of that: about $396,000 in 2010-11 and about $356,000 in 2011-12. In all, of the over $2 million in funds he received, he spent only $1,186,001 on expenditures designated for Southwest.

Shulick's failure to spend these funds on Southwest was part of an elaborate conspiracy to embezzle money. Shulick directed the unspent funds to co-conspirator Chaka Fattah, Jr., an employee and confidante of Shulick and the son of former U.S. Representative Chaka Fattah, Sr. The two agreed that Fattah, Jr. would use the funds to pay off various liabilities incurred across Shulick's business ventures, while also keeping a cut of the embezzled money for himself.

At Shulick's trial, a number of former DVHS employees testified to the harmful effects this scheme had. Teachers explained that students dealing with abuse, addiction, trouble with the law, and other personal and familial hardships never received access to the counseling assistance Shulick

4

promised to provide. Without security staff on site, teachers had to attempt to keep the children safe while also educating them. Some employees confronted Shulick about his failure to pay for these services for Southwest's students. He would lie and direct his staff to misrepresent and misreport to cover up his fraud.

## B. Procedural History

After a multi-year investigation, Shulick was indicted on October 11, 2016. He was charged with conspiring with Fattah, Jr. to embezzle from a program receiving federal funds (18 U.S.C. § 371); embezzling funds from a federally funded program (18 U.S.C. § 666(a)(1)(A)); wire fraud (18 U.S.C. § 1343); bank fraud (18 U.S.C. § 1344); making a false statement to a bank (18 U.S.C. § 1014); and three counts of filing false tax returns (26 U.S.C. § 7206(1)). He was arraigned on October 13, 2016. The wire fraud charges were subsequently dropped.

A year later, Shulick moved to dismiss the indictment, asserting his speedy trial rights. The District Court denied his motion (and later, renewed motions), and the case ultimately went to trial. Following a three-week trial, a jury convicted him on May 8, 2018 on all charges.

On the conspiracy, federal program embezzlement, bank fraud, and false statement counts, Shulick was sentenced to 60 months' imprisonment and three years' supervised release. On the three tax fraud convictions, Shulick was sentenced to 20 months for each count, to be served consecutively to each other but concurrently with the sentence on the other convictions, plus a year of supervised release. The District Court also imposed two fines of $20,000 each and a special assessment of $700. It ordered restitution of $759,735 to the School District and $5,000 to PNC Bank.

II.[1]

Shulick appeals, asserting several theories to challenge his conviction and sentence. After careful consideration, we reject each.

A. The District Court did not violate Shulick's speedy trial rights

Shulick first argues his conviction must be reversed because the District Court violated his constitutional and statutory rights to a speedy trial. The Sixth Amendment guarantees "the right to a speedy . . . trial." U.S. Const. amend. VI. To effectuate this constitutional guarantee, Congress enacted the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, which "set[s] specified time limits . . . within which criminal trials must be commenced." *United States v. Williams*, 917 F.3d 195, 199 (3d Cir. 2019) (quoting *United States v. Rivera Constr. Co.*, 863 F.2d 293, 295 (3d Cir. 1988)).

The Speedy Trial Act requires that trial begin within 70 days of indictment or initial appearance, whichever occurs later. 18 U.S.C. § 3161(c)(1). However, certain periods of time may be excluded, including when a judge grants a continuance "on the basis of his findings that the ends of justice served by [the continuance] outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A).

In August 2017, as trial preparation was drawing to a close, the Government discovered that years before, during its lengthy investigation, one of the servers seized from DVHS had been filed under the wrong case number. Instead of being

---

[1] The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 to review its final order of conviction, and under 18 U.S.C. § 3742 to review the sentence.

filed with the investigation into Shulick and Fattah, Jr.'s conspiracy, the server was mistakenly filed with a separate, unrelated investigation into former Congressman Chaka Fattah, Sr. On realizing this mistake, the Government promptly informed the District Court and made an untimely production of 1.5 million pages of documents and 900,000 emails. It declined, however, to voluntarily dismiss the indictment.

Shulick, invoking the Speedy Trial Act, moved to dismiss the indictment. The District Court denied his motion, saying it was only speculation that the remaining 64 days on the 70-day clock would expire before the case was ready for trial.[2] The Court also stated that, upon an appropriate motion by the parties or *sua sponte*, it could, if necessary, continue the trial upon making the appropriate findings to support that the ends of justice would be served by a delay. In a separate order, the Court did just that. It issued an ends-of-justice continuance under § 3161(h)(7)(A) and moved the previously scheduled October 2, 2017 trial to April 11, 2018.

Shulick argued in the District Court that the Speedy Trial Act does not permit such a continuance where the delay is caused by a "lack of diligent preparation . . . on the part of the attorney for the Government." 18 U.S.C. § 3161(h)(7)(C). Rejecting that characterization, the Court held that

> the ends of justice served by granting this continuance outweigh the best interest of the public and defendant in a speedy trial, specifically the case is so unusual or complex due to the nature of the prosecution that it is

---

[2] Six of the 70 days had passed between Shulick's initial appearance and an order by the District Court deferring the trial based on the complexity of the case and time needed for defense counsel to prepare.

7

> unreasonable to expect adequate preparation by
> defense counsel for the trial itself within the time
> limits otherwise set by the Speedy Trial Act.

App. 46; *see* 18 U.S.C. § 3161(h)(7)(B)(ii) (listing case complexity as one of statutory bases for an ends-of-justice continuance).

Shulick now argues that despite the District Court articulating case complexity as its motivating reason, the continuance could only have been granted for one reason—the Government's faulty production. The Court's ruling was therefore in error, says Shulick, because "[t]he reasons stated by the judge" are required to "actually have been the factors motivating his decision to grant the continuance." *United States v. Crane*, 776 F.2d 600, 606 (6th Cir. 1985). Shulick also contends, as he did below, that the continuance was not permissible, because "[n]o continuance . . . shall be granted because of . . . lack of diligent preparation . . . on the part of the attorney for the Government." 18 U.S.C. § 3161(h)(7)(C).

We review a district court's interpretation of the Speedy Trial Act *de novo*; its fact-finding for clear error; and its decision to grant a continuance, after proper application of the statute to the facts, for an abuse of discretion. *United States v. Rivera Constr. Co.*, 863 F.2d 293, 295 n.3 (3d Cir. 1988). Beginning with Shulick's first argument, we first note there is ample evidence to support that the case is complex. The prosecution, stemming from a multi-year investigation involving millions of pages of documents, was designated as complex under 18 U.S.C. § 3161(h)(7)(B)(ii) from the time of arraignment on October 13, 2016. The granting of continuances in response to the various intricacies and knots in the case is nothing new. In fact, Shulick requested and was granted multiple continuances to wade through discovery materials.

Beyond that, Shulick's reliance on *Crane* is misplaced. There, the Sixth Circuit concluded that the district judge's stated reasons for granting a continuance—case complexity, among other things—were not the court's actual motivation. 776 F.2d at 604. But unlike here, the district judge in *Crane* admitted arranging "for [a] [m]agistrate to impanel a jury," despite being unavailable to try the case for the following two weeks, in "an inappropriate effort to begin the trial within the 70 days." *Id.* at 606 (citation omitted). Shulick has offered no evidence of any similar inappropriateness, only an unsubstantiated claim of pretextuality. We see nothing to suggest the District Court acted with "an intent to merely pay the Act lip service," *United States v. Gonzalez*, 671 F.2d 441, 444 (11th Cir. 1982); rather, it rightfully acted to remedy the Government's admitted discovery violation by continuing the trial to avoid prejudicing the defense and by enforcing a previously issued ban on the prosecution from using at trial any documents produced after June 1, 2017. This was a proper remedy. *See United States v. Cianciola*, 920 F.2d 1295, 1300 (6th Cir. 1990) (holding that the district court properly granted a continuance when the Government inadvertently failed to timely provide discovery, as "the interests of justice in allowing defense counsel more time to prepare for trial outweighed the need for a speedy trial").

Shulick's second argument posits that even if the District Court's stated reason was the actual reason for the continuance, the Government's failure to comply with discovery rules categorically prohibits an ends-of-justice continuance, because a discovery violation always constitutes a "lack of diligent preparation" under § 3161(h)(7)(C). The Government responds by citing persuasive authority holding that a discovery violation does not rise to the level of a "lack

9

of diligent preparation" unless it was in bad faith or the violations were chronic.

The Speedy Trial Act does not define a "lack of diligent preparation" and we have not yet addressed whether that phrase means any discovery violation or only those of the more egregious variety. Requiring a chronic mistake or bad faith does, however, find support in decisions of our sister Circuits and in persuasive district court rulings. *See, e.g.*, *Cianciola*, 920 F.2d at 1300 (district court rightly excluded delay caused by prosecutor's inadvertent failure to mail a discovery response because it was neither in bad faith nor chronic); *United States v. Henry*, 698 F.2d 1172, 1174 (11th Cir. 1983) (district court did not abuse its discretion in finding delay excludable, where the Government failed to fully comply with all discovery orders, as "a trial judge must be given broad discretion in attempting to comply with the mandates of the Speedy Trial Act and the exclusions thereto"); *United States v. Huff*, 246 F. Supp. 2d 721, 726-27 (W.D. Ky. 2003) ("[I]t would be unfair to classify the United States' omission as a lack of preparedness especially where the Court found that the United States acted negligently, not in bad faith or as part of a pattern of chronic discovery abuse."); *see also United States v. Jain*, No. 19-cr-59 (PKC), 2020 WL 6047812, at *11 (S.D.N.Y. Oct. 13, 2020) (collecting additional cases).

We are persuaded by these cases. "[T]he Speedy Trial Act was not intended 'to provide defendants with tactics for ensnaring the courts into situations where charges will have to be dismissed on technicalities.'" *Cianciola*, 920 F.2d at 1298 (*quoting United States v. Bufalino*, 683 F.2d 639, 646 (2d Cir. 1982)). Rather, it is well within the district courts' expertise to distinguish between one-off or lesser discovery violations and those committed chronically or in bad faith. Leaving these matters with the district courts also comports with their general

authority to oversee discovery and craft appropriate remedies for discovery violations. *See United States v. Lee*, 573 F.3d 155, 161 (3d Cir. 2009) ("When a party fails to comply with [Federal Rule of Criminal Procedure 16, which governs discovery and discovery violations], the district court is empowered to order that party to comply with the Rule, grant a continuance, exclude the evidence, or enter other just relief."). Just as the District Court here fashioned an appropriate continuance and sanction in response to the Government's discovery practices, so too will other trial judges craft an appropriate response on a case-by-case basis—something which Shulick's categorical approach would preclude.

Having rejected Shulick's categorical rule, we now hold that he fails to meet his burden of showing that the Government's untimely production rises to the level of a "lack of diligent preparation" under the facts of the case. 18 U.S.C. § 3161(h)(7)(C). Shulick contends the Government's conduct was "chronic," pointing to the District Court's previous criticisms of its slow, rolling productions during discovery. However, these critiques pertained to earlier productions, not the August 2017 production at issue. Shulick never asserted any speedy trial claim with respect to these earlier productions, instead using them as grounds for requesting multiple continuances.[3] Shulick fails to make any non-cursory argument about why the Government's admittedly careless discovery mistake—a one-time administrative mishap, which the prosecution promptly admitted and which the District Court

---

[3] This is not to say that a series of slow productions, even those concerning different discoverable material, can never support a "lack of diligent preparation."

appropriately remedied—is chronic. The continuance did not violate the Speedy Trial Act.

Separate from his Speedy Trial Act argument, Shulick argues that his Sixth Amendment right to a speedy trial was violated. "In assessing a constitutional speedy trial claim, we consider the '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'" *United States v. Shaw*, 891 F.3d 441, 454 (3d Cir. 2018) (quoting *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). "All factors must be considered and weighed as no one factor is dispositive nor 'talismanic.'" *Hakeem v. Beyer*, 990 F.2d 750, 759 (3d Cir. 1993) (quoting *Barker*, 407 U.S. at 533).

Applying the factors, the District Court found no Sixth Amendment violation. It reasoned that there was an 18-month delay from indictment to trial attributable to the Government and that Shulick indeed asserted his right. He failed, however, to establish prejudice. We review the District Court's factual findings for clear error and legal conclusions *de novo*. *United States v. Velazquez*, 749 F.3d 161, 174 (3d Cir. 2014).

On appeal, Shulick argues, first, that the District Court erred because it did not consider pre-indictment delay in its *Barker* analysis. He relies on *United States v. Ingram*, in which the Eleventh Circuit held it "appropriate to consider inordinate pre-indictment delay in determining how heavily post-indictment delay weighs against the Government." 446 F.3d 1332, 1339 (11th Cir. 2006). Shulick insists that the Government delayed from the time the investigation began in 2011, and that an indictment could have been secured by late 2014. He was not indicted until October 2016.

The District Court correctly rejected this argument. Unlike the Eleventh Circuit, we have held that "[t]he speedy trial guarantee of the Sixth Amendment does not apply to pre-indictment delay." *United States v. Sebetich*, 776 F.2d 412, 429

12

(3d Cir. 1985).[4] This Court has explained that no "rights under the Sixth Amendment . . . attach to a preindictment, pre-arrest delay" as "'the Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an "accused," an event which occurred in this case only when the appellees [defendants] were indicted . . . .'" *United States v. Dukow*, 453 F.2d 1328, 1330 (3d Cir. 1972) (quoting *United States v. Marion*, 404 U.S. 307, 313 (1971)). As in *Dukow*, "our inquiry on the speedy trial contention is at an end because the indictment in this case was handed down within the applicable period of limitations." *Id.*

Shulick's second Sixth Amendment argument is that the District Court wrongly rejected his claim of prejudice—the most important factor in the *Barker* analysis. *Hakeem*, 990 F.2d at 760. This factor is to be "assessed in light of certain of the interests which the speedy trial right was designed to protect: preventing oppressive pretrial incarceration, minimizing anxiety and concern of the accused, and limiting the possibility that the defense will be impaired." *Virgin Islands v. Pemberton*, 813 F.2d 626, 629 (3d Cir. 1987). Pointing to that final interest, Shulick argues his ability to present a defense was prejudiced when a witness, Philadelphia School District Assistant Superintendent Benjamin Wright, was rendered unavailable by illness. The District Court, however, determined that Shulick failed to offer sufficient

---

[4] Rather, it is "the Due Process Clause of the Fifth Amendment [which] protects defendants against oppressive pre-indictment delay within the applicable limitations period." *Id.* at 430. Shulick, however, has only raised a Sixth Amendment claim and has not attempted to "invoke the extreme sanction of dismissal . . . under the Due Process Clause." *Id.*

13

factual support for this supposed prejudice, because he did not explain what Wright's testimony would be or even that it would be favorable, despite having interviewed him before he became unavailable.

On appeal, Shulick asserts—but again fails to substantiate—that Wright's testimony would have been "important[] to Shulick's authorization and good faith defense." Appellant's Br. 40. As the District Court correctly concluded, a conclusory claim of this sort falls short of what is required of a defendant to successfully establish prejudice. *See Hakeem*, 990 F.2d at 763 ("General allegations that witnesses' memories have faded are insufficient to create prejudice . . . Hakeem has not pointed to any evidence in the state record that shows the [witnesses] would have been able to corroborate his presence . . . ."). For example, in *United States v. Harris*, the Fifth Circuit rejected a vague claim of prejudice similar to Shulick's. 566 F.3d 422, 433 (5th Cir. 2009). There, the defendant argued he was prejudiced by the loss of a witness who died twenty months after the indictment. *Id.* The defendant, however, backed up his claim with only a conclusory assertion that the witness "could have supported defense assertions of innocence at trial." *Id.* Such a "blanket statement," said the court, "gives no indication as to the content and relevance of the lost testimony, and how its absence impaired [the] defense." *Id.* Shulick's nonspecific claim of prejudice is inadequate for this very same reason. The *Harris* court also noted that the defendant failed to "explain why he or his attorneys failed to take any steps to preserve [the witness's] testimony for trial." *Id.* Shulick's defense has been similarly neglectful.

Beyond Shulick's failure to substantiate his claim of prejudice, his Sixth Amendment argument must be rejected for another reason. Even if Shulick's claims about Wright's

testimony were true, the District Court correctly reasoned that the School District's (and Wright's) purported satisfaction with Shulick's performance is legally irrelevant. "The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct." *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995). Thus, having rejected both his statutory and constitutional claims, we conclude that the District Court did not violate Shulick's speedy trial rights.

## B. The District Court's challenged evidentiary rulings were not erroneous

Shulick next argues that the District Court committed reversible evidentiary and instructional errors. We review a decision on the admissibility of evidence for an abuse of discretion and review on a plenary basis a district court's interpretation of the Federal Rules of Evidence. *United States v. Gonzalez*, 905 F.3d 165, 195 (3d Cir. 2018).

## 1. The District Court properly defined "agency" under 18 U.S.C. § 666 and rightfully excluded an agency clause in the Southwest contract

Shulick was convicted under 18 U.S.C. § 666, which criminalizes theft from organizations receiving federal funding. Under the statute, (1) "an agent of an organization" (2) who "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property" (3) that "is valued at $5,000 or more" and (4) is "owned by, or is under the care, custody, or control of such organization," commits a federal offense. 18 U.S.C. § 666(a)(1)(A). For the statute to apply, the organization must "receive[], in any one year period, benefits in excess of $10,000 under a Federal program." *Id.* § 666(b).

15

In seeking to overturn his federal program theft conviction, Shulick targets the requirement that the defendant be an "agent" of the organization receiving federal funds. *Id.* § 666(a)(1)(A). He argues he was not an "agent" within the meaning of the statute.

Under the statutory definition, an "agent" is "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." *Id.* § 666(d)(1). An independent contractor who exercises managerial responsibility can be an "agent." *United States v. Vitillo*, 490 F.3d 314, 323 (3d Cir. 2007) (stating that § 666(d)(1)'s list is not exhaustive, as "an 'agent' is merely a person with authority to act on behalf of the organization receiving federal funds").

With respect to agency, Shulick posits two errors. First, he argues the District Court wrongly prohibited him from presenting evidence of a clause in the Southwest contract which reads: "Neither the Contractor nor the School District shall have any power to bind the other party in any manner whatsoever to any third party. The Contractor does not function as an agent of the School District in its dealings with any third party." App. 4946-47. The District Court ruled this clause irrelevant, reasoning that the parties "cannot bind the federal government in a criminal trial . . . by simply saying they're not agents of one another." App. 4455.

While "the bar for what constitutes relevant evidence is low," *Forrest v. Parry*, 930 F.3d 93, 114 (3d Cir. 2019), it cannot be said that the District Court's ruling was an abuse of discretion. Indeed, the very cases Shulick cites support exclusion of the clause. In *United States v. Lupton*, the Seventh Circuit pointedly explained the lack of relevance of any such contractual provision:

16

Whether Lupton is considered an "agent" for purposes of 18 U.S.C. § 666 is determined by that statute, not by the terms of a private contract. Parties cannot contract around definitions provided in criminal statutes; even if Lupton could not be considered a common law agent under [the] contract, it is nonetheless possible for him to be an "agent" under the terms of 18 U.S.C. § 666(d)(1). . . . The statutory definition of 'agent' is an expansive one.

620 F.3d 790, 800-01 (7th Cir. 2010); *see also United States v. Hudson*, 491 F.3d 590, 594 (6th Cir. 2007) (stating that the contract "does not resolve the inquiry" and rather, the focus should be on "whether [the defendant] satisfies the statute's general definition of an agent—whether [he] was 'authorized to act on behalf of' the school district'" (quoting 18 U.S.C. § 666(d)(1)). Here, the District Court did not stumble in disregarding the parties' contractual delineation of the scope of Shulick's authority, especially given the substantial evidence showing that Shulick had the power to act on behalf of the School District. He was given significant managerial control over the administration of Southwest, such as the power to hire and fire teachers, establish curriculum, and control day-to-day activities.

Next, Shulick challenges the District Court's jury instruction on the agency element. The Court used language from the Third Circuit's model instruction, but also altered the model in one respect. The model instruction reads:

A person may be an agent of an organization without being an employee of that organization. An outside consultant who exercises significant managerial responsibility within the

> organization is an agent of that organization if
> the consultant is authorized to act on behalf of
> the organization.

Third Cir. Model Crim. Jury Instr. 6.18.666A1A-1. The District Court read the first sentence of the model but omitted the second.[5] Shulick challenges that omission on appeal. However, he failed to make this objection in the District Court, which "would constitute a waiver of [his] right to assert any legal error unless it was of such a magnitude as to constitute plain error." *Karabin v. Petsock*, 758 F.2d 966, 969 (3d Cir. 1985). There was no plain error. "[A] model jury instruction itself is neither law nor precedential," but is "designed to help litigants and trial courts . . . to distill the law correctly." *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 190 (3d Cir. 2019). Here, the District Court adopted the crux of the model instruction—someone outside an organization can also be an agent—and that statement of the law accords with our interpretation of § 666(d)(1). *Vitillo*, 490 F.3d at 323.

---

[5] The Court also correctly instructed the jury that:

> An agreement between the parties to a contract .
> . . does not establish an agency relationship is not
> binding on the federal government in a criminal
> prosecution. You must disregard any testimony
> or other exhibit as to what the School District of
> Philadelphia and Shulick, Delaware Valley High
> School or Unique Educational Experiences has
> agreed regarding any agency relationship in their
> contracts. However, you may consider other
> evidence related to the issue of agency.

App. 4423-24.

18

2. The District Court properly excluded irrelevant evidence

Shulick next argues that the District Court abused its discretion in excluding evidence that would have shown that he did not, as § 666(a)(1)(A) requires, use funds "without authority"—*i.e.* in an "unauthorized or unjustifiable or wrongful" way. *United States v. Baroni*, 909 F.3d 550, 582 (3d Cir. 2018), *abrogated on other grounds by Kelly v. United States*, 140 S. Ct. 1565 (2020). This evidence included a prior request for proposal put out by the School District, which arguably suggested that the District placed little importance on a contract's budget by weighting it at only 10% in a ranking system used to evaluate bids for the job. It also included evidence showing that School District employees failed to object to certain expenditures which did not conform to the contract's budget, thereby ratifying them, according to Shulick.

We see no abuse of discretion. The District Court appropriately excluded the request for proposal on relevancy grounds because it was specific to a 2008 bidding process that predated by two years Shulick's involvement with Southwest and DVHS's contract with the School District. On appeal, Shulick merely re-ups his disagreement with the Court's relevancy determination but offers no legal authority or reasoned argument to show reversible error.

The District Court also rightfully barred the evidence suggesting that School District employees failed to affirmatively object to Shulick's noncompliant expenditures. As we have already noted, "[t]he negligence of the victim in failing to discover a fraudulent scheme is not a defense," *Coyle*, 63 F.3d at 1244, so victim inobservance indeed bore no relevance. The school district's failure to catch Shulick's crimes does not negate his fraud.

### 3. The District Court properly excluded the expert testimony of Frederick Hamilton

Shulick next challenges the District Court's exclusion of Frederick Hamilton's testimony on the ground that he was an untimely-disclosed expert witness. According to Shulick, the trial court improperly classified Hamilton's presentation as expert testimony, subject to Federal Rule of Criminal Procedure 16's disclosure regime, rather than summary evidence. *See* Fed. R. Evid. 1006 (allowing a "summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.").

The record shows otherwise. In a sidebar discussion partway through the trial, District Judge Bartle questioned defense counsel about their plans to call Hamilton as a witness. In this discussion, as recounted in a judicially-approved statement under Federal Rule of Appellate Procedure 10(c), the Government asked the District Court to direct Shulick's counsel to fully disclose Hamilton's expert opinions, bases, and reasons. *See* Fed. R. Crim P. 16(b)(1)(C) (requiring a defendant to, "at the government's request, give to the government a written summary" of any planned expert testimony, which "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."). At the time of this conversation, the defense had provided only minimal information on Hamilton, namely, his curriculum vitae and a short description of what he might testify to—a disclosure which Judge Bartle agreed was insufficient under Rule 16. Importantly, Judge Bartle stated that if Shulick wanted to offer Hamilton as an expert witness, the defense would have to make an additional, full disclosure of his opinions, bases, and reasons. Judge Bartle then specifically asked defense counsel whether they intended to

20

offer Hamilton as an expert. Defense counsel responded that they would not make any further disclosure and that Hamilton would be offered solely as a summary witness.

But when Hamilton was called to the stand at the opening of the defense case, he attempted to offer expert testimony. Specifically, Hamilton, a CPA who acknowledged that he had previously served as an expert "hundreds of times," App. 4135, was asked why it was appropriate to allocate certain shared costs across Shulick's business ventures to the budget for Southwest—a post-hoc analysis, involving the application of Hamilton's own formulas and judgment to facts. The District Court ultimately excluded this testimony, accepting the Government's argument that it was undisclosed "expert opinion based on his years of accounting experience, based on his forensic background, and based on information that is not available from the records." App. 4146-47.

We agree and reject Shulick's characterization of Hamilton's sophisticated analysis as mere summary. If a purported summary includes "assumptions" and "inferences" that "represent [the witness's] opinion, rather than the underlying information," it is actually expert testimony "subject to the rules governing opinion testimony." *Eichorn v. AT&T Corp.*, 484 F.3d 644, 650 (3d Cir. 2007). Here, the witness's testimony would have involved him explaining his analytical assumptions and professional opinion, based on his accounting expertise, that it was appropriate to allocate some of Shulick's general (and even unrelated) business costs as expenditures for the Southwest school. The apportionments Hamilton advanced were not contained in any of the documents governing the parties' relationship. Rather, they would have required the retroactive application of business and accounting principles and Hamilton's own judgment to the

21

facts—in other words, classic expert testimony, rightly excluded.

C.  The District Court did not commit reversible error in defining "intentional misapplication" under 18 U.S.C. § 666(a)(1)(A)

Shulick next claims there was reversible error in the District Court's jury instructions on federal program theft. The federal program theft statute makes liable a person who "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or *intentionally misapplies*, property." 18 U.S.C. § 666(a)(1)(A) (emphasis added). Shulick argues the District Court erred in instructing that an intentional misapplication within the meaning of § 666(a)(1)(A) can be found even if the misuse of funds still benefited the victim.

In so stating to the jury, the District Court deployed 3d Cir. Model Jury Inst. 6.18.666A1A-3, stating:

> To intentionally misapply money or property means to intentionally use money or property of the School District of Philadelphia, knowing that such use is unauthorized or unjustifiable or wrongful. Misapplication includes the wrongful use of the money or property for an unauthorized

[purpose],[6] *even if such use benefitted the School District of Philadelphia.*

App. 4425-26 (emphasis added). Shulick contends the emphasized language is bad law.

We exercise plenary review over the question of whether a jury instruction contained an incorrect statement of law. *Robinson*, 920 F.3d at 190 n. 38.; *United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011). Federal program theft occurs when the defendant "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts *to the use of any person other than the rightful owner* or intentionally misapplies, property." 18 U.S.C. § 666(a)(1)(A) (emphasis added). The emphasized phrase is a limiting condition, which would require that the property be used for someone else's benefit besides the defrauded organization. In other words, if the funds were still used to benefit the "rightful owner"—as our model instruction provides—then this condition would not be satisfied and federal program theft would not have occurred.

However, in parsing the statutory language, we must be careful to determine which word or words this limiting condition modifies. Again, federal program theft occurs when the defendant "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of

---

[6] In reading this instruction, the District Court accidentally substituted the word "person" for "purpose," saying that "[m]isapplication includes the wrongful use of money or property for an unauthorized person." App. 4426. After being alerted of this slip of the tongue, the Court corrected its misstatement, saying "I said 'unauthorized person.' I should have said 'unauthorized purpose,' and you will see that in the written instructions -- that it's correct, 'unauthorized purpose.'" App. 4464.

any person other than the rightful owner *or* intentionally misapplies, property." 18 U.S.C. § 666(a)(1)(A) (emphasis added). The disjunctive "or" suggests that an intentional misapplication of funds is a separate way of satisfying the statute, apart from the earlier prohibition on conversion, which is subject to the aforementioned limiting phrase. Under the rule of the last antecedent, that qualification should be read only to modify the word it immediately follows: "converts." *Id.* § 666(a)(1)(A); *see Lockhart v. United States*, 136 S. Ct. 958, 962 (2016) (applying limiting phrase in a statute to only "the antecedent immediately preceding it"). Most importantly for our purposes, it would not narrow the meaning of "intentionally misapplies," as Shulick would have it.

Use of those words of limitation earlier in § 666(a)(1)(A) also shows that Congress knew how to expressly impose a condition that would require the defrauded property to inure to another's benefit for liability to attach. If Congress wished to subject intentional misapplication to this same condition, it could have included parallel language after intentional misapplication—for example, drafting the statute to read: "intentionally misapplies for the use of any person other than the rightful owner, property." Congress, however, did not do that. We generally presume such differences in drafting to be purposeful. *In re Bayer AG*, 146 F.3d 188, 193 (3d Cir. 1998).

The interpretation we have espoused thus far finds additional support when we compare the current version of § 666(a)(1)(A) to an earlier version of the statute. The prior version placed the limiting condition after all six statutory prohibitions, including willful misapplication, the precursor to the "intentionally misapplies" prohibition. *See* Act of Oct. 12, 1984, Pub. L. 98-473, 98 Stat. 1837, 2143 ("embezzles, steals, purloins, *willfully misapplies*, obtains by fraud, or otherwise

knowingly without authority converts *to his own use or to the use of another*") (emphases added). Under this version of the statute, Shulick would have a better argument that the condition qualifies all words before it, as a unitary whole. But, by separating the intentional misapplication offense from that qualifying language in the current text, Congress intended, we believe, to reinforce that this term was not so limited. *See Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

Shulick counters this by pointing to words in the legislative history which refer to Congress' revisions as only a "technical" amendment. S. Rep. No. 99-278, 99th Cong., 2d Sess. (1986) (accompanying S. 1236, 99th Cong. § 59(a) (enacted bill)), at 7 (1986); H.R. Rep. No. 99-797 (1986) (accompanying H.R. 5241, 99th Cong. § 42(a) (House version) (1986)), at 30). But such statements, which do not even address the interpretive question at issue, cannot overcome what the plain text commands. *United States ex rel. Mistick PBT v. Hous. Auth.*, 186 F.3d 376, 395 (3d Cir. 1999) ("[R]ecourse to legislative history or underlying legislative intent is unnecessary when a statute's text is clear and does not lead to an absurd result.").

Our sister Circuits have also refused to limit intentional misapplication under § 666(a)(1)(A) as Shulick asks us to do. *See United States v. Urlacher*, 979 F.2d 935, 938 (2d Cir. 1992) ("The first four prohibitions cover any possible taking of money for one's own use or benefit," so "in order to avoid redundancy, ['intentionally misapplies'] must mean intentional misapplication for otherwise legitimate purposes."); *United States v. Cornier-Ortiz*, 361 F.3d 29, 37 (1st Cir. 2004) (citing *Urlacher* to conclude that using funds for legitimate purposes, but in violation of conflict of interest rules, is still an intentional

25

misapplication); *United States v. Frazier*, 53 F.3d 1105, 1114 (10th Cir. 1995) (concluding there was a misapplication even though "[t]he funds were [still] used to purchase computers and computer equipment for the educational organization," the victim). We too have once stated that § 666(a)(1)(A) reaches an unauthorized use of property which nevertheless benefits the victim. *See United States v. Baroni*, 909 F.3d 550, 582 (3d Cir. 2018) ("Misapplication includes the wrongful use of the money or property for an unauthorized purpose, even if the use actually benefitted the Port Authority." (quoting the District Court's recantation of 3d Cir. Model Jury Inst. 6.18.666A1A-3)).

*Baroni*, however, was reversed by *Kelly v. United States*. 140 S. Ct. 1565 (2020). Under *Kelly*, says Shulick, the rule of Model Instruction 6.18.666A1A-3 is no longer good law. In *Kelly*, Bridget Anne Kelly and William Baroni, two officials in the administration of former New Jersey Governor Chris Christie, conspired to shut down toll plaza lanes on the George Washington Bridge to punish the mayor of Fort Lee for refusing to endorse Christie's reelection bid. *Id.* at 1569-70. A jury convicted Kelly and Baroni under § 666(a)(1)(A). Reversing their convictions, the Supreme Court held that the federal program theft statute was designed to safeguard only against "*property* fraud" and not to "criminaliz[e] all acts of dishonesty." *Id.* at 1571. The defendants' convictions were therefore improper, because they never sought "to take the government's property"—they sought only to divert the State's regulatory power to injure a political adversary. *Id.* at 1572.

Shulick argues, as he did below, that *Kelly* forecloses a conviction under § 666(a)(1)(A) where the jury has been instructed that a misapplication of funds may still occur if the defendant's unauthorized spending still benefited the victim. According to Shulick, the jury, having heard this instruction,

26

may have convicted based on a belief that he did not take funds for his own or Fattah, Jr.'s benefit, but simply spent them inconsistently with the budget yet still benefiting the School District. *Kelly*, however, "confirms that §666(a)(1)(A) criminalizes [only] schemes to 'obtain' a victim's property: 'taking' the property and 'converting' it to someone else's use," according to Shulick. Appellant's Reply 22 (quoting 140 S. Ct. at 1568, 1573-74). He contends that just as Kelly and Baroni "exercised the regulatory rights of 'allocation, exclusion, and control'—deciding that drivers from Fort Lee should get two fewer lanes while drivers from nearby highways should get two more," 140 S. Ct. at 1573, so too did he exercise the rights given to him in reallocating the budget—an act unauthorized by the contract, but not one which § 666(a)(1)(A) criminalizes.

We are unpersuaded that the contested jury instruction runs afoul of *Kelly*. The *Kelly* Court reversed the defendants' convictions because the Government failed to show that an "object of their fraud was 'property.'" 140 S.Ct. 1565, 1571 (2020) (quoting *Cleveland v. United States*, 531 U.S. 12, 26 (2000)). The defendants unquestionably abused their power to influence how government property (the bridge) would be used, but the taking of property was not the object or aim of their scheme. *Id.* at 1574. The goal was political retribution. *Id.* Accordingly, the scheme could not support a conviction under § 666(a)(1)(A). *Id.*

*Kelly* did not announce a "benefit" rule—that a § 666(a)(1)(A) violation may never occur unless the defendant converted property for his benefit and to the detriment of the proper recipient of federal funds. Rather, *Kelly* requires only that property be the "object" of the scheme. *Id.* at 1571. This is an important distinction. Shulick and his business had secured multiple contracts from the School District of Philadelphia to

27

run several of its educational institutions. Under these contracts, he ran both the Southwest School from which he is alleged to have embezzled and also another School District institution, the Kelly Drive School. **App. 3422.** At trial, the Government contended that Shulick took property entrusted to him under the Southwest contract and used it to pay other obligations he owed, including some under the Kelly Drive contract. For example, the jury heard testimony describing payments made, at Shulick's direction, to cover labor costs at the Kelly Drive School, while obligations owed to Southwest were ignored. **E.g., App. 3458, 3460, 3714**. And, during closing arguments, the Government pressed this theory that funds were misappropriated to pay Kelly Drive expenses. App. 4317 ("[M]oney for Kelly Drive kids . . . nothing for the Southwest kids."); App. 4324 ("Kelly kids . . . getting their counselors. Not the Southwest kids."). Shulick's trial counsel conceded that DVHS "was required to provide, hire, fund and managed a certified counselor at each DVHS site" and, unlike other DVHS schools, this was not done at Southwest. App. 4350. Counsel's defense was to shift the blame to Fattah, Jr. and other of Shulick's subordinates, while portraying Shulick's misconduct as merely a breach of contract. The jury was unpersuaded.

The prosecution's theory that Shulick schemed to take funds from the Southwest contract and use them to pay his obligations under another contract with the same school district is consistent with *Kelly*. The object of such a crime is unquestionably property—the goal is to misapply funds that were promised to the children at Southwest and spend them at a different institution. This theory is also consistent with the jury instruction Shulick contests. As that instruction reads, Shulick "use[d] [the] money" under the Southwest contract "for an unauthorized [purpose]"—to pay his liabilities under

the Kelly Drive contract—"even [though] such use benefitted the School District of Philadelphia," because the Kelly Drive School was within the same School District. App. 4426. Taking funds remitted to the School District, but designated for Southwest, and using them to pay other debts owed to the School District under a wholly separate contract is a property fraud, even though the money still inured to the School District's benefit. The jury instruction permitting such a conviction, thus, does not violate *Kelly*.

Even if it did, Shulick could not prevail. That is because any error would be harmless. Where a jury has been "'instructed on alternative theories of guilt and may have relied on an invalid one'" we apply "harmless-error review." *United States v. Riley*, 621 F.3d 312, 323 (3d Cir. 2010) (quoting *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam)). This "doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence" as the rule "promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). Thus, we reverse only if the error affects a defendant's "substantial rights." *See* Fed. R. Crim. P. 52(a).

Shulick claims the jury instruction is inconsistent with the federal program theft statute as defined by *Kelly*. This "error is harmless when 'it is *highly probable* that the error did not contribute to the judgment.'" *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (citing *Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir. 1976)). Accordingly, the jury's decision is to be upheld where we "possess a 'sure conviction that the error did not prejudice' the defendant." *Id.* (quoting *United States v. Jannotti*, 729 F.2d 213, 219-20 (3d Cir. 1984).

29

When we "consider [the purported] error in light of the record as a whole," as we must, *id.*, we are indeed sure it did not prejudice Shulick. "Where there is a clear alternative theory of guilt, supported by overwhelming evidence, a defendant likely cannot show that an instruction permitting the jury to convict on an improper basis was not harmless error." *United States v. Andrews*, 681 F.3d 509, 521 (3d Cir. 2012). While *Andrews* is a plain error case, "we may properly rely upon both harmless and plain error precedent in deciding whether [Shulick] has shown that the [purported *Kelly*] violation affected his substantial rights," because "[t]he substantial rights inquiry under each [of plain error and clear error review] is essentially identical, with the exception of the burden of proof." *United States v. Vazquez*, 271 F.3d 93, 100 (3d Cir. 2001). Though the burden rests with the Government, careful review of the record as a whole shows that any error was harmless.

At trial, the Government put forth a clear, unquestionably *Kelly*-compliant theory of guilt—Shulick actually embezzled contract funds and used them for his own benefit. In other words, his "aim [was] to obtain money," a classic property fraud. *Kelly*, 140 S. Ct. at 1574. This "alternative theory"—which was the Government's primary theory of the case—was well-supported and compelling. First, the Government presented overwhelming evidence that Shulick spent only a fraction of the $2,096,000 he received under the contract on Southwest. He did not hire promised counseling and security personnel, understaffed Southwest's teaching staff, and cut corners on salaries and benefits. The records demonstrating these facts were carefully and thoroughly summarized and explained by a credible FBI agent, and the deficiencies were repeatedly confirmed by several former DVHS employees who testified against Shulick. Even

30

the testimony of Shulick's expert witness, Hamilton, indicated that he spent only $1,186,001 on items designated for Southwest.[7] This was not the case of a contractor being a few dollars short here and there.

Next, the Government presented extensive testimonial and documentary evidence of what happened to the unspent money. Shulick diverted the funds to co-conspirator Fattah, Jr., who took his cut and paid other of Shulick's obligations, including some expenses entirely unrelated to Southwest and the School District of Philadelphia. Some payments, for example, were remitted to cover the costs of running other charter schools outside of the School District. Others were used to cover bills, consulting fees, business solicitation services, and public relations expenses that Shulick incurred to make his business ventures profitable. These ventures included DVHS but also his personal law firm, the Law Offices of David T. Shulick. In short, the Government showed that contract funds were disbursed in ways which personally benefited Shulick and Fattah, Jr. and which did not benefit the School District of Philadelphia in any way. Accordingly, the object of the conspiracy's scheme advanced at trial was unquestionably

---

[7] Hamilton explained an exhibit containing his summation of all expenditures "specific to" Southwest. App. 4240. The total was $1,186,001. The defense sought to increase this figure by having Hamilton explain why it would be appropriate to allocate certain other shared business and non-Southwest expenses to Shulick's total expenditures on Southwest. But as we previously concluded, this was undisclosed expert testimony properly excluded by the District Court. *See supra* Part II.B.3. The admissible evidence plainly showed that Shulick fell far short of what the budget required him to spend.

property—Shulick took money entrusted to DVHS and embezzled it for the conspirators' personal benefit.

This is not a case "where evidence on the valid alternative theory is relatively weak, the government relies heavily on the improper theory, and the district court's instructions on the improper theory are 'interwoven' throughout the jury charge." *Andrews*, 681 F.3d at 522. As described above, there was strong evidence that Shulick actually converted hundreds of thousands of dollars. Nor did the Government rely heavily on the theory that Shulick attacks.

Rather, prosecutors consistently maintained that Shulick "embezzled" funds for his own gain.[8]

The jury charge likewise reflected this core theory. It identified several ways by which Shulick could be found guilty of misappropriating the money. *See* App. 4425 (listing "embezzle," "obtain by fraud," and "convert"). The intentional misapplication instruction did not dominate the charge. It was

---

[8] For example, the prosecution frequently and consistently described Shulick's crime as an embezzlement or theft act in opening and closing arguments. App. 1319-20 ("You're going to hear that [the contract funds] went into David Shulick's pocket . . . Mr. Shulick would put the money into an account and then use that account like his personal piggybank, cutting business checks to pay for personal expenses . . . Now, for his actions, he stands charged with embezzling"); 1325 ("Now, the first thing Fattah Junior did was take his own cut. . . . And the remaining 60,000 went to pay Mr. Shulick's expenses in other places"); 1330 ("Mr. Shulick is guilty of embezzlement and conspiracy to embezzle"); 4276 ("Here is a man who is dedicated to stealing money"); 4276 ("He embezzled nearly a million dollars"); 4300 ("we'll move on to the embezzlement"); 4306 ("So, now, we come to counts 1 and 2, the embezzlement of the school district funds. The defendant embezzled $1 million . . ."); 4307 ("the defendant is charged in a conspiracy with Mr. Fattah Jr. to embezzle school district funds. He's also charged separately, by himself, in count 2, with embezzling school district funds."); 4310 ("It's criminal agreement . . . [t]o embezzle, from a federally funded program . . . So what are the elements of embezzlement?"); 4317 ("There's money to be stolen here."); 4326 ("You should find him guilty of his conspiracy with Fattah Jr. and with embezzling $1 million").

listed once alongside these other statutory prohibitions. A "single [challenged] instruction . . . may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *United States v. Park*, 421 U.S. 658, 674 (1975) (internal quotation marks and citation omitted). Viewing the charge in its entirety, it is clear that the disputed line was not interwoven throughout the greater whole, repeated, or otherwise emphasized. *See Andrews*, 681 F.3d at 522 (upholding conviction even where "the District Court [incorrectly] referred to 'honest services' on several occasions in its final instructions," because the erroneous term was not "interwoven throughout the jury charge."). The whole charge placed far greater emphasis on Shulick as a property taker. *See, e.g.*, App. 4442 ("Count 2 of the indictment charges the defendant, David. T. Shulick, with *embezzling* funds from the School District of Philadelphia . . .") (emphasis added). The District Court also warned the jury "not to single out any one instruction" but to "consider as a whole all of the instructions." App. 4395; *see United States v. Bryant*, 655 F.3d 232, 247 (3d Cir. 2011) (rejecting a challenge to the wording of a specific instruction partly because jury was told "to consider all of the 'instructions as a whole'").

This case is not like *Kelly*, where the prosecution's claim of property fraud rested only on a novel theory that the defendants temporarily "commandeer[ed]" the George Washington Bridge (despite obviously not stealing the massive structure) or caused only incidental wage expenses associated with carrying out their regulatory action. 140 S. Ct. at 1572. Shulick committed a real, tangible taking of money that was rightly owed to the School District and the at-risk children of Southwest. That was the Government's consistent, chief theory throughout the trial, and the evidence of this reality was overwhelming. *See Cupp v. Naughten*, 414 U.S. 141, 147

(1973) ("[A] judgment of conviction is commonly the culmination of . . . witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury" so "not only is the challenged instruction but one of many . . . but the process of instruction itself is but one of several components of the trial which may result in the judgment"). Therefore, even if Shulick's reading of *Kelly* was correct, he still would have been convicted of federal program theft irrespective of the error.

### D. The District Court rightfully refused to instruct the jury on the safe harbor provision of 18 U.S.C. § 666(c)

Further challenging the jury instructions on federal program theft, Shulick next postulates error when the District Court refused to instruct on § 666(c), a safe harbor provision excluding from criminal liability "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c). We review a refusal to give a specific jury instruction for an abuse of discretion. *Friedman*, 658 F.3d at 352. A defendant is entitled to an instruction on a theory of defense "if (1) he proposes a correct statement of the law; (2) his theory is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include an instruction of the defendant's theory would deny him a fair trial." *United States v. Hoffecker*, 530 F.3d 137, 176 (3d Cir. 2008) (citation omitted).

Shulick fails to show that his theory is supported by the evidence. He offers only a cursory, single paragraph as to why he was entitled to a safe harbor instruction. He says, in effect, that while his expenditures fell short for certain items in the budget, he exceeded the budget for other items and other of his spending benefited the School District. However, Shulick cites

35

no case law in support of his position and, as the Government aptly notes, he has not even attempted to identify the salary, wages, fees, compensation, or expenses that would supposedly fit within the safe harbor. Nor has he provided this missing information in his reply brief, even after the Government pointed out the deficiency. *See Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006) ("Judges are not like pigs, hunting for truffles buried in the record.") (internal quotation marks and citation omitted). The District Court did not abuse its discretion in declining to provide the instruction.

E. The District Court properly calculated the fraud loss, credits against loss, forfeiture, and restitution

Shulick asserts several errors in the District Court's calculations at sentencing. We review an interpretation of the sentencing guidelines, including what constitutes loss, *de novo*, and factual findings for clear error. *United States v. Napier*, 273 F.3d 276, 278 (3d Cir. 2001).

He first contends the District Court erred in computing a fraud loss of $795,735 for the § 666 counts. The District Court calculated the School District's loss by subtracting the amount that Shulick actually spent on various budgeted items from the amount the budget required him to spend. In performing this calculation, the Court referenced Note 3(F)(ii) to Sentencing Guideline § 2B1.1. It provides that "[i]n a case involving government benefits (e.g., grants, loans, entitlement program payments)," the loss is "the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be." U.S.S.G. § 2B1.1, cmt. n.3(F)(ii). Shulick argues that Note 3(F)(ii) does not apply here, and should not have been relied upon, because DVHS's management of Southwest was a "fee-for-service business deal" and not a "a case involving governmental benefits."

36

Appellant's Br. 72-73. The District Court, says Shulick, should have used the general definition of fraud loss set forth in Note 3(A): "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A).

We agree with the Government that whether the moneys are "governmental benefits" or not does not matter under the facts of this case and the calculation performed. In calculating the fraud loss, the District Court properly applied our precedent, *United States v. Nagle*, 803 F.3d 167, 180 (3d Cir. 2015). There, we explained that "[w]e need not decide whether the [disadvantaged business enterprises] program is a 'government benefit' and, therefore, whether Note 3(A) or Note 3(F)(ii) applies." *Id.* at 180. "[U]nder either application note," we said, "the amount of loss [the defendants] are responsible for is the face value of the contracts . . . minus the fair market value of the services . . . provided under the contracts." *Id.* at 180. *Nagle* confirms that the challenged computation—the contract's face value less the value of services Shulick actually provided—is in fact correct. This difference constitutes the actual pecuniary loss the School District suffered when Shulick spent only a fraction of the contract funds on its students.

Shulick next argues that the District Court erred in calculating credits against loss. Note 3(E)(i) instructs that the fraud loss is to "be reduced by the value of the services rendered by a defendant to the victim." U.S.S.G. § 2B1.1, cmt. n.3(E)(i). Shulick claims that the Court reduced the loss figure by some, but not all, of the value of the services he rendered to Southwest.

It was Shulick's burden to show that he was entitled to specific offsets, because the Government made out a *prima facie* case of the loss amount. *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008). The District Court held that he

failed to meet that burden. It rejected the calculations of Shulick's accounting expert, Hamilton, who allocated to Southwest (1) 34% of expenditures that also covered Shulick's law office and three other schools; (2) DVHS's income taxes, accounting expenses, and insurance premiums; (3) substantial payments to Fattah, Jr.; and (4) a number of payments to persons not provided for in the Southwest contract, including the salaries of employees of other schools and a car and benefits package for DVHS's bookkeeper, whose responsibilities also included working on Shulick's personal finances. Declining to calculate the offsets as Hamilton proposed was not clearly erroneous. Shulick simply did not carry his burden to show that additional money was spent for the benefit of Southwest.

Lastly, Shulick challenges the District Court's restitution and forfeiture calculations. He first argues that the Mandatory Victims Restitution Act limits restitution to "pecuniary loss" suffered as a "direct and proximate" result of the defendant's conduct. 18 U.S.C. § 3663A(c)(1)(B), (a)(2)). His argument merely re-ups the same theories which he unsuccessfully advanced above and which also fail here; the District Court properly calculated the actual loss suffered under *Nagle*. As to forfeiture, Shulick argues the District Court failed to expressly find that Shulick acquired the funds. But it did. The Order of Forfeiture states: "Based upon the facts and arguments set forth in the government's Memorandum Regarding Fraud Loss . . . and the record as a whole, the sum of $649,735.00 represents the value of property the defendant obtained directly or indirectly . . . ." District Ct. Dkt. #216 at 2.

F. The District Court did not err in supplementing the record

Shulick's final argument attacks the District Court's decision to supplement the record with a binder that defense

expert Hamilton relied upon while testifying at Shulick's sentencing. Hamilton brought the binder to the stand with him, but Shulick's counsel did not ask about it on direct examination. When Shulick's counsel concluded, the District Court permitted the Government to review the binder and during cross-examination, the Government questioned Hamilton about various materials in the binder. Although the District Court stated that the binder "was referred to, so we may want to put it in the record," App. 4658, this was not done at the time. Instead, the Court instructed Hamilton to provide prosecutors with a copy of the binder, which they agreed to accept instead of having it formally entered into the record. A copy never arrived, so the Government moved to supplement the record. The District Court granted the motion.

We review the District Court's decision to supplement the record for an abuse of discretion. *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 327 n.16 (3d Cir. 2015). A district court may supplement the record if "anything material to either party is omitted from or misstated in the record by error or accident." Fed. R. App. P. 10(e)(2)(B). Here, the District Court determined that the binder had been omitted by error, because the defense had not delivered a copy as instructed. The binder was material, according to the District Court, as it contained information supporting the foundation for Hamilton's fraud loss calculation—an issue which Shulick himself raises on appeal. In light of the discretion afforded to the District Court on this matter, we cannot say that it abused its discretion in supplementing the record. The binder was not "new evidence," having been relied upon by a testifying expert and specifically referenced by the Government on cross-examination; supplementation was, thus, for the proper purpose of "correct[ing] inadvertent omission." *In re Adan*, 437 F.3d 381, 389 n.3 (3d Cir. 2006).

III.

For the foregoing reasons, we will affirm.